825 So.2d 134 (2000)
Donald BROADNAX
v.
STATE.
CR-97-0113.
Court of Criminal Appeals of Alabama.
June 30, 2000.
Opinion on Return to Remand December 1, 2000.
Rehearing Denied January 12, 2001.
*149 John McAlpine Wood, Birmingham, for appellant.
Bill Pryor, atty. gen., and Kathryn D. Anderson, asst. atty. gen., for appellee.

On Application for Rehearing
FRY, Judge.
The opinion of March 31, 2000, is withdrawn, and the following is substituted therefor.
*150 In October 1996, a Jefferson County grand jury returned an indictment against the appellant, Donald Broadnax, charging him with four counts of capital murder, including murder of two or more persons pursuant to one scheme or course of conduct, see  13A-5-40(a)(10), Ala.Code 1975; murder by a defendant who has been convicted of another murder in the 20 years preceding the crime, see  13A-5-40(a)(13); murder during a kidnapping in the first degree, see  13A-5-40(a)(1); and murder of a victim less than 14 years old, see  13A-5-40(a)(15). On June 6, 1997, a jury found Broadnax guilty of each of the four counts of capital murder. At the penalty phase of the trial, the jury, by a vote of 12 to 0, recommended that Broadnax be sentenced to death. On September 12, 1997, the trial court, after a sentencing hearing, followed the jury's recommendation and sentenced Broadnax to death. On October 9, 1997, Broadnax filed a motion for new trial. On August 14, 1998, the trial court denied Broadnax's motion for new trial.[1] This appeal followed.
The evidence tended to show the following. In April 1996, Donald Broadnax, who had been convicted in 1978 for murder and who was serving a sentence of 99 years' imprisonment, was residing at a work release center in Alexander City and working at Welborn Forest Products in Alexander City. In 1995 Broadnax married Hector Jan Stamps Broadnax, who at the time of the marriage had a three-year-old grandson, DeAngelo Stamps. Broadnax and Jan were having marital problems and Broadnax believed that Jan was partially responsible for a recent denial of parole. The evidence indicated that after 6:00 p.m. on April 25, 1996, Jan and DeAngelo delivered food to Broadnax at his workplace. Johnny Baker, an inmate at the work release center and Broadnax's coworker at Welborn, testified that he saw Broadnax driving Jan's car at Welborn that evening. According to Baker, Broadnax stopped to talk with him and he saw a child in a child's safety seat in the backseat. Baker testified that he was "pretty sure" the child was alive when he talked with Broadnax.
At approximately 10:45 p.m. that same night, Mark Chastain, a security guard at Welborn, found Broadnax inside a building while securing the building for the night. Chastain testified that he told Broadnax that the alarm had been set and that they had to exit the building. According to Chastain, when he asked Broadnax why he was still in the building, Broadnax stated that the work release van had dropped him off. As they left the building, Broadnax called the work release van to pick him up. Chastain did not leave the area until the work release van picked Broadnax up.
Kathy Chastain, Mark Chastain's wife, testified that while she was outside the building waiting for her husband to secure the building, she saw an individual matching Broadnax's description get out of a light-colored truck and run into the building.
On April 25, 1996, Robert Williams and his wife were living across the street from a house in Birmingham that had in the past been used as a "crack-house" and for prostitution. On that evening as Williams and his wife left their house at approximately 8:20 p.m., they noticed no cars were parked at the house across the street. When they returned at approximately 8:50 p.m., they saw a white Dodge Aries automobile parked behind the house. Because of the previous illegal activities occurring at the house, Williams telephoned *151 the police and reported the presence of the car.
Alondo McCurdy and Donna Smith, officers for the Birmingham Police Department, responded to the call and arrived at the residence at approximately 9:00 p.m. When they approached the parked car, they noticed blood on the ground behind the car and on the bumper. Based on their observations, they immediately radioed their supervisor and the paramedics, and secured the scene. It was later determined that the car belonged to Jan Broadnax.
When the paramedics arrived, they opened the locked trunk and found the bodies of Jan and DeAngelo in the trunk. Both Jan and DeAngelo had been beaten. According to Dr. Robert Brissie, the forensic pathologist who performed the autopsies on the victims, blunt-force trauma, which could have been caused by the use of a piece of lumber such as the one found in the trunk with the bodies, caused the deaths of Jan and DeAngelo.
On April 27, 1996, Lawrence Hardnette, an inmate resident at the work release center in Alexander City, found a work uniform that did not belong to him stuffed under his bunk. At about the same time, James Smith, another inmate resident of the work release center, found a pair of Red Wing brand work boots under his bunk. The uniform and the boots were turned over to the supervisors and were later identified as belonging to Broadnax. Broadnax was the only one at the work center who wore Red Wing work boots; there were also identifying marks on the work uniforms indicating that the uniforms had been issued to Broadnax. When the work uniform and the boots were examined, bloodstains were found on the uniform. The analysis of the bloodstains indicated that the deoxyribonucleic acid ("DNA") in these bloodstains matched the DNA of Jan and DeAngelo.
On the grounds at Welborn near a finishing products storage facility, employees found an earring that matched an earring found on the rear floorboard of Jan's car. The evidence appeared to indicate that Jan was killed at Broadnax's workplace in Alexander City, that her body was placed in the trunk of the car, and that the car was driven to Birmingham. Officer Vince Cunningham of the Birmingham Police Department testified that while conducting the investigation, he traveled from the location where the bodies were found in Birmingham to Broadnax's workplace in Alexander City. According to Cunningham, Broadnax could have easily traveled the distance between the two locations within the time frame set out by the evidence.
In his brief to this Court, Broadnax raises several issues, which were not presented to the trial court. Because Broadnax was sentenced to death, his failure to raise these claims at trial does not prevent our review. It does, however, weigh against him as to any claim of prejudice he now makes. See Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"Additionally, this Court has said:
"`"[This] plain error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).'
"Dunaway v. State, 746 So.2d 1021, 1027 (Ala.Cr.App.1998).

*152 "`In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'
"Rule 45A, Ala.R.App.P."
Minor v. State, 780 So.2d 707, 725-26 (Ala. Cr.App.1999).

Guilt-Phase Issues

I.
Broadnax contends that the trial court's failure to have certain portions of the trial proceedings transcribed requires a reversal of his convictions because, he says, it prevented him from obtaining a full review of the critical portions of his trial. Specifically, he argues that a transcript of the pre-trial proceedings, the bench conferences, and the hearing on the motion for a new trial should have been included in the record on appeal.
Our review of the record indicates that Broadnax did not move to have all portions of the proceedings transcribed. Thus, our review is subject to the plain-error standard. See Rule 45A, Ala.R.App.P.
In Ex parte Land, 678 So.2d 224 (Ala. 1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), this Court addressed a similar issue, stating:
"The portions of the trial that Land says were not transcribed involve selection of the jury venire and striking the jury; bench conferences among the trial judge, the prosecution, and defense counsel; or the polling of the jury. Regarding transcription of a capital murder trial ... Rule 19.4(a), Ala.R.Crim.P., states:
"`In all capital cases (criminal trials in which the defendant is charged with a death penalty offense), the court reporter shall take full stenographic notes of voir dire of the jury and of the arguments of counsel, whether or not such is ordered by the judge or requested by the prosecution or defense. This duty may not be abrogated by the judge or waived by the defendant.'
"(Emphasis added in [Land].)
"In Ex parte Harris, [632 So.2d 543 (Ala.1993),] this Court noted that the phrase `arguments of counsel,' as it is used in Rule 19.4(a), does not refer to `every incidental discussion between counsel and the trial judge that occurs at the bench,' but, rather, refers only to counsel's opening and closing arguments. 632 So.2d at 545. Thus, it is clear that Rule 19.4(a) did not require the court reporter to transcribe the various bench conferences now placed in issue by Land. Although Land claims error in the lack of a transcript of the court's selection of the venire and of the actual striking of the jury, Rule 19.4(a) requires only transcription of the `voir dire of the venire,' which was transcribed in full and which is part of the record in this case. Nor does Rule 19.4(a) require transcription of the polling of the jury."
678 So.2d at 245 (footnote omitted).
The record indicates that Broadnax filed a motion to supplement the record with the trial court and this Court on April 21, 1999. This Court ordered the trial court to dispose of Broadnax's motion within 21 days from the date of the order. On April 27, 1999, the trial court denied the motion stating that there were no transcripts of the pre-trial proceedings or the proceeding on the motion for a new trial. Broadnax *153 filed an additional motion to supplement the record on May 17, 1999, and based on the trial court's order indicating that there were no transcripts of the proceedings, the motion to supplement was denied.
In this case, Broadnax claims that transcripts of a suppression hearing and a Frye[2] hearing were omitted from the record. Although the case action summary indicates that there were preliminary hearings set for certain dates, the record does not indicate that any preliminary hearings were actually conducted.
Additionally, Broadnax claims that a "previous discussion" between the trial court and the venire was not recorded. (Broadnax's brief to this Court at p. 2.) However, the record contains a transcript of the voir dire proceedings from the trial court's introduction of the case through the striking of the jury. Thus, we find no support for Broadnax's contention.
The case action summary also indicates that a hearing on the motion for a new trial was set for August 14, 1998, and that the motion for a new trial was denied on that date. However, there are no notations in the case action summary indicating that a hearing on the motion for a new trial occurred.
Broadnax argues that "it is quite possible the trial court [during the hearing on his motion for a new trial] evaluated the effectiveness of Mr. Broadnax's trial counsel at the motion for [a] new trial, or that the trial court evaluated possible juror misconduct issues." (Broadnax's brief to this Court at p. 3.) The record does not support this argument. First, we note that these issues were not filed in Broadnax's motion for a new trial filed on October 9, 1997. Additionally, the record does not contain any amended or supplemental filings concerning his motion for a new trial; therefore, we question whether these issues were presented to the trial court. The record, however, does indicate that Broadnax's trial counsel was not permitted to withdraw until December 1, 1998, when appellate counsel was appointed. The hearing on his motion for a new trial, according to Broadnax, occurred on August 14, 1998, when he was represented by trial counsel. Indeed, an argument by trial counsel that trial counsel had been ineffective, made at a hearing on his motion for a new trial, if a hearing was in fact conducted, would be untimely and absurd. Furthermore, Broadnax does not allege any specific claims of error from the record that were adversely determined at the alleged hearing. Thus, we fail to find, and Broadnax fails to show, any prejudice with regard to the trial court's denial of his motion for a new trial.
Our review of the trial proceedings indicates that the court reporter transcribed all portions of the record required by Rule 19.4(a), Ala.R.Crim.P., to be transcribed. Furthermore, there is no indication in the case action summary that any pre-trial or post-trial hearings were conducted. Based on the record before us and the trial court's response to our order dated April 27, 1999, we conclude that Broadnax's argument is based on mere speculation. We note that Broadnax does not assert that in any of his requests or motions for transcription of these proceedings or offer support with an affidavit from trial counsel that these proceedings occurred or that a court reporter was present. We cannot conclude from such a silent record and such a minimal showing from Broadnax that plain error occurred. Thus, after reviewing the record at the point of each transcript omission referenced by Broadnax and in light of the fact *154 that transcription of the entire proceedings pursuant to Rule 19.4, Ala.R.Crim.P., occurred, we conclude that the alleged lack of a complete transcript has not adversely affected his substantial rights. Therefore, we find no plain error.

II.
Broadnax contends that the trial court "reversibly erred to permit the state to proceed against [him] on four capital charges for two deaths." (Issue XXI in Broadnax's brief to this Court at p. 91.) He argues that the four-count indictment violated his Fifth Amendment and Fourteenth Amendment protection against double jeopardy. Broadnax did not object at trial to the four-count indictment; therefore, we review for plain error. Rule 45A, Ala.R.App.P.
This Court addressed the merits of a claim similar to Broadnax's claim in Williams v. State, 710 So.2d 1276 (Ala.Cr. App.1996), aff'd, 710 So.2d 1350 (Ala.), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), stating:
"[T]he test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime contains a statutory element not contained in the other. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); see also United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993)(a plurality of the United States Supreme Court reaffirmed the Blockburger test as the sole criterion for judging double jeopardy claims); Seritt v. State, 647 So.2d 1 (Ala.Cr.App.), cert. denied, 647 So.2d 1 (Ala.1994). In this case, each capital offense charge required proof of an element that the other did not. Proof of the murder-robbery charge required proof of a robbery in the first degree, which the multiple murder charge did not require.... We therefore conclude that under the Blockburger test, the appellant was properly indicted and convicted for two separate and distinct capital offenses `notwithstanding a substantial overlap in the proof offered to establish the crimes,' Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); Jackson v. State, 516 So.2d 726, 761 (Ala.Cr.App.1985), rem'd on other grounds, 516 So.2d 768 (Ala.1986). Therefore, the charges were not multiplicitous and the appellant's convictions for both offenses did not violate the Double Jeopardy Clause."
710 So.2d at 1321.
Because each capital offense charged in Broadnax's indictment required proof of an element the other did not, we find no error, plain or otherwise.

III.
Broadnax contends that the trial court erred when it allowed the jury to separate each evening. (Issue XX in Broadnax's brief to this Court.) Specifically, he argues that sequestration of the jury was necessary because of the great amount of publicity surrounding this case. He further argues that the trial court's allowing the jury to separate without his consent denied him of his right to a fair trial and denied him of his right to due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and under the Alabama Constitution and Alabama law.
The trial court, in allowing the jury to separate, acted pursuant to  12-16-9, Ala.Code 1975, amended effective June 15, 1995, which provides:
"In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative *155 or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate."
Broadnax argues that jury separation at the time of his trial, however, should be governed by Rule 19.3, not  12-16-9, Ala. Code 1975. At that time, Rule 19.3 required sequestration of a jury in a deathpenalty case, unless all parties agreed to allow the jury to separate. Broadnax claims that, pursuant to Rule 19.3, sequestration of the jury is necessary to avoid "the improper injection of arbitrary passion [or] prejudice" in cases such as his, where "the offense [charged] received an extraordinary amount of publicity, and where many of the jurors were familiar with the offense." (Broadnax's brief to this Court at p. 91).
The Alabama Supreme Court recently addressed this issue in Ex parte Stewart, 730 So.2d 1246 (Ala.1999), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999). In Stewart the Court held:
"Where two provisions directly conflict, this Court may presume that the Legislature intended to repeal the earlier provision by adopting the later one. The version of Rule 19.3 in effect at the time of Stewart's third sentencing hearing became effective on January 1, 1991. The amended version of  12-16-9 became effective on June 15, 1995. The irreconcilable language of that later provision compels us to conclude, as the Court of Criminals Appeals did, that the Legislature intended to change the effect of Rule 19.3 insofar as it conflicted with  12-16-9. When the Legislature, through a general act, changes the procedural rules promulgated by this Court, we are bound by the Constitution and the laws of this state to give effect to the Legislature's changes. Therefore, we conclude that the Court of Criminal Appeals correctly held that  12-16-9 overrode the conflicting portions of Rule 19.3."[3]
730 So.2d at 1250. See also Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998), rev'd on other grounds, 777 So.2d 295 (Ala. 2000). Accordingly, pursuant to  12-16-9, Ala.Code 1975, as amended, the trial court had complete discretion to sequester the jury.
At the beginning of the presentation of the evidence, the trial court instructed the jury as follows:
"In the meantime [the jury] is going to be in recess. While you're in recess do not discuss the case with anyone. Do not allow anyone to discuss it with you. And also, do not discuss it among yourselves. Do not read, watch or listen to any news accounts concerning this case or go by any locations for the purposes of testing your observation against the testimony and recollection of witnesses."
(R. Vol. IV at 158.) Throughout the course of the trial, the trial court periodically reminded the jury of those instructions. Moreover, no incidents regarding improper jury influence were brought to the trial court's attention during the course of Broadnax's trial and Broadnax presents no such incident on appeal. What Broadnax has presented to this Court is only bare allegations of prejudice that, he says, resulted from the trial court's failure to sequester the jury; he offers no concrete factual basis to support these claims. We will not base error on speculation and conjecture. In deciding to allow the jury to separate, the trial court *156 in this case did so with great caution, providing adequate instructions to the jury. Therefore, we conclude that the trial court did not abuse its discretion when it permitted the jury to separate.

IV.
Broadnax claims that "[t]he trial court reversibly erred when it denied [him] access to records essential to mounting a defense and rebutting the state's case." (Issue XI in Broadnax's brief to this Court at p. 73.) Specifically, Broadnax argues that the trial court's denial of access to materials requested in paragraphs 7.a and 9 of his request for production was reversible error. Broadnax cites Ex parte Monk, 557 So.2d 832 (Ala.1989), and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in support of his argument.
On May 9, 1997, Broadnax filed a request for production. (C.R.128-30.) The record indicates the trial court reviewed each paragraph of the request and indicated whether each paragraph should be granted or denied. According to Broadnax, the following requests were erroneously denied:
"7. To permit the Defendant to analyze, inspect, and copy or photograph any and all books, papers, documents, tangible objects, controlled substances, buildings or places, or portions of any of these things which are in the possession, custody and control of the state and:
"a. Which are material to the preparation of the defense, including made by the district attorney or his agents, or by law enforcement agents, in connection with this investigation or prosecution of the case, or statements made by state witnesses or prospective state witnesses, including police incident reports and supplemental reports; and
". . . .
"9. Any and all material in the possession of the state, or which through due diligence may be learned by the state, which might exculpate the Defendant, negate the charges against him, or lead to a reasonable doubt as to his guilt. This includes, but is not limited to, promises or agreements as to treatment afforded state witnesses, information having to do with witnesses's incorrect identification, results of scientific, physical or medical tests which might exculpate the Defendant."
(C.R.129-30.)
Rule 16.1(e), Ala.R.Crim.P., states, in pertinent part:
"[T]he discovery or inspection of reports, memoranda, witness lists, or other internal state/municipality documents made by the prosecutor or the prosecutor's agents, or by law enforcement agents, in connection with the investigation or prosecution of the case, or of statements made by state/municipality witnesses or prospective state/municipality witnesses, is not authorized."
This Court stated in Maples v. State, 758 So.2d 1, 33 (Ala.Cr.App.1999), aff'd, 758 So.2d 81 (Ala.1999):
"`In Alabama, there is no constitutional right to discovery in a criminal case. Rule 19, Ala.R.Crim.P., affords an accused, a limited right of discovery in a pending criminal action. The extent of discover is within the discretion of the trial court. As this court stated in Mason v. State, 768 So.2d 981, 1001 (Ala.Cr. App.1998):
"`"While [Ex parte] Monk[, 557 So.2d 832 (Ala.1989),] does encourage liberal discovery in capital murder cases, it does not mandate that the state disclose to a defendant the name and address of every individual who *157 has furnished information to the state in the investigation of a crime; rather, `Monk made it clear that whether to order discovery beyond that required by the constitution or by state law or rule is discretionary with the trial court.' Council v. State, 682 So.2d 500, 501 (Ala.1996)(Hooper, C.J., concurring specially in denial of certiorari review)."'
"Ex parte Land, 775 So.2d 840, 843 (Ala.Cr.App.1998)(emphasis original). A trial judge may order more extensive discovery when a defendant is facing the death penalty, but Monk does not require that the judge do so. Rather, the extent to which discovery will be allowed lies within the discretion of the trial court."
We find little direction in Broadnax's brief regarding specifically what discovery he was denied or how he was prejudiced by the state's alleged failure to produce the information. We note that during a hearing regarding the admission of some telephone records, the state indicated that it had an open-file policy with Broadnax. (R. Vol. VII at 12.) There is no indication in the record on appeal other than bare allegation and speculation by Broadnax that the state withheld any information to which he was entitled.[4]
In addition, Broadnax presents a bare claim that the denial of his discovery request prevented him from gathering and presenting mitigating evidence. However, Broadnax fails to provide this Court with any example or offer any proof of what the suppressed evidence might be or how the trial court's ruling prejudiced him. We simply refuse to engage in speculation to find the reversible error Broadnax urges.
Moreover, we have reviewed the trial court's ruling in light of the entire record, and we conclude that the trial court did not abuse its discretion in denying Broadnax's general requests for discovery in paragraphs 7.a and 9 of his motion for production.

V.
Broadnax contends that the trial court erred in admitting into evidence photographs of the victims at the crime scene and during their autopsies. (Issue IX in Broadnax's brief to this Court.) Specifically, he argues that because there were so many photographs admitted and because they were so horrendous, the force of these pictures overwhelmed the emotions of the jury and resulted in prejudice against him.
Initially, we note that at the outset of the trial Broadnax stated that his objection to the crime scene photographs was based upon the grounds that such pictures were repetitive, "horrendous" and prejudicial to his case. (R. Vol. III at 10.) The trial court reviewed the crime scene photographs and the state agreed to remove at least four because they were repetitive. Broadnax did not enter another objection to the crime scene photographs. Additionally, we find no objection from Broadnax when either the crime scene or the autopsy photographs were admitted. Because Broadnax did not receive an adverse ruling upon which to predicate error, we conduct a plain error review. Rule 45A, Ala. R.App.P.

*158 A.
Broadnax first disputes the admission into evidence of nearly 75 photographs of the crime scene. Approximately one-half of the photographs were of the victims and the other half depicted other aspects of the crime scene. In Pilley v. State, 789 So.2d 870, 882 (Ala.Cr.App. 1998), rev'd on other grounds, 789 So.2d 888 (Ala.2000), we addressed the issue of the admissibility of photographs:
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d 474 [ (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) ]."
789 So.2d at 882. See also Rule 402, Ala. R.Evid. Photographs that depict the crime scene are relevant and, therefore, admissible. Aultman v. State, 621 So.2d 353 (Ala. Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987).
"`The fact that a photograph is gruesome and ghastly is no reason to exclude it from evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, 494 So.2d [124,] 141 [ (Ala.Cr.App. 1985) ]. See also Hutto v. State, 465 So.2d 1211 (Ala.Cr.App.1984); Jones v. State, 439 So.2d 776, (Ala.Cr.App.1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr. App.1982).'"
Gentry v. State, 689 So.2d 894, 907 (Ala.Cr. App.1994), rev'd on other grounds, 689 So.2d 916 (Ala.1996)(quoting Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), rev'd on other grounds, 625 So.2d 1146 (Ala.1993)). Moreover, "`[t]his rule of law applies not only to photographs, but to photographic slides as well. Goffer v. State, 430 So.2d 896 (Ala.Cr.App.1983).'" Lee v. State, 562 So.2d 657, 663 (Ala.Cr. App.1989).
"`"Photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence,  207.01(2) (4th ed.1991). "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).'
"DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991)."
Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996) (emphasis added.) See also Giles v. State, 632 So.2d 568 (Ala.Cr.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
However, in some cases, even relevant evidence is excluded on other grounds.
"Although relevant, evidence may be excluded if its probative value is substantially *159 outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
Rule 403, Ala.R.Evid. (Emphasis added.)
We conclude from our review of the record and the photographs that the admission of the crime scene photographs does not constitute reversible error. These pictures were offered to assist the jury in its understanding of the testimony of one of the detectives who investigated the crime scene and the testimony of the crime scene evidence technician. (R. Vol. IV at 253, 285-93). Therefore, despite the number of gruesome photos, they constituted an essential part of the state's case and were necessary to the jury's comprehension of the witnesses' testimony.

B.
Broadnax also argues that the admission of over 70 graphic photographs taken during the autopsies of the victims was prejudicial to his case.
The history of the admission of autopsy photographs is extensive:
"With regard to photographs of the victim,... even though they are cumulative and pertain to undisputed matters, generally photographs that depict the external wounds on the body of the victim are admissible. Bankhead, 585 So.2d at 109. As we held in Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App. 1992), aff'd, 627 So.2d 1054 (Ala.1993), `[t]he state [has] the burden of proving that the victim [is] dead, and [photographs are] direct evidence on that point....'"
Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr. App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996) (emphasis added.) Moreover, autopsy photographs depicting the internal views of wounds are likewise admissible. In Dabbs v. State, 518 So.2d 825, 829 (Ala.Cr.App.1987), we stated that even though autopsy photographs of a victim's head injuries, as viewed internally, may be gruesome, admission of such photos is sometimes necessary to demonstrate the extent of the victim's injuries. See Dabbs, supra.
Our review of Dr. Brissie's testimony indicates that the autopsy photographs that were admitted into evidence during his testimony depicted pictures of the victims, their blood, bruising, and both external and internal views of their wounds. Although the autopsy photographs may have been disturbing, we agree with the trial court that the photos were indeed relevant to illustrate the extent of the victims' injuries and they were necessary to corroborate the testimony of Dr. Brissie. The pictures taken during the autopsies obviously "shed light" on such crucial issues as the deaths of the victims and the manner and method of their deaths. See Dabbs, supra. Thus, we agree their admission into evidence was not plain error.
In conclusion, we agree with the trial court's determination that despite the nature and number of pictures admitted, the admission of both the crime scene photographs and the autopsy photographs was necessary to assist the jury in its understanding of the various witnesses' testimonies. The trial court committed no plain error in this regard.

VI.
Broadnax maintains that the trial court erred in failing to order a change of venue for his trial because, he says, many of the jurors had heard about the case through what he says was extensive media *160 coverage and, he says, this exposure prevented him from receiving a fair trial. (Issue XVII in Broadnax's brief to this Court.)
Our review of the record indicates that Broadnax did not move for a change of venue; therefore, his claim will be reviewed only for plain error. Rule 45A, Ala.R.App.P.
During the voir dire examination of potential jurors, the veniremembers were asked whether they had read or heard anything concerning this case. The record indicates that although some of the jurors stated that they had heard about the case, none of the potential jurors indicated that they could not put what they had heard out of their minds.
In Boyd v. State, 715 So.2d 825 (Ala.Cr. App.1997), this Court stated:
"`"[A] change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make `the court proceedings nothing more than a "hollow formality"' ... or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant."'
"George v. State, [717] So.2d [827] at 833 [(Ala.Cr.App.1996) ], quoting Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. 1993).
". . . .
"`The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt of innocence. Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). A defendant is entitled to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, id. The record in this case indicates that the appellant received such a trial. See also Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). Because the appellant has failed to show that the pre-trial publicity in this case was "inherently prejudicial," Holladay v. State, [549 So.2d 122 (Ala.Cr.App.1988) ], or "presumptively prejudicial," Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.1991), and the appellant has also failed to show that there was actual juror prejudice, we find no abuse of discretion by the trial court or manifest error in his finding of impartiality and his denial of the appellant's motion for change of venue. Irvin v. Dowd, 366 U.S. at 724, 81 S.Ct. at 1643; Ex parte Grayson, 479 So.2d at 80.'
"Oryang v. State, 642 So.2d at 993-94."
715 So.2d at 848.
"`Newspaper articles or widespread publicity, without more, [is] insufficient to grant a motion for change of venue.'" Harris v. State, 632 So.2d 503, 517-18 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), quoting Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).
The voir dire conducted by the trial court and by counsel clearly showed that none of the prospective jurors were prejudiced by pretrial publicity. Therefore, Broadnax has failed to show that any actual prejudice resulted from the pretrial publicity. *161 Boyd v. State, supra; Williams v. State, supra; Oryang v. State, 642 So.2d 989, 993 (Ala.Cr.App.1994). Cf. Ex parte Neal, 731 So.2d 621 (Ala.1999); Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998), aff'd, 778 So.2d 237 (Ala.2000); and Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Thus, the trial court did not commit plain error in conducting the trial in Jefferson County.

VII.
Broadnax contends that the trial court erred in denying his motion for individual voir dire. (Issue XVI in Broadnax's brief to this Court.) Specifically, he argues that because he was required to conduct voir dire in a group setting, he was not given ample opportunity to question individual veniremembers' knowledge of this case, resulting in a denial of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and under the Alabama Constitution and Alabama law.
The record indicates that Broadnax filed a pretrial motion requesting individualized voir dire on the grounds that this case involved such sensitive issues as the death penalty and pre-trial publicity, that individual questioning was required to select a fair and impartial jury. (R. Vol. I at 119-120.) Although the trial court denied this motion, it made certain accommodations to limit the possibility of any prejudice, stating that it would allow individual questioning of any potential jurors who had a fixed opinion regarding the death penalty or who exhibited prior knowledge about the case. (R. Vol. I at 120.) The record reveals that potential jurors who indicated that they had any reservations about capital punishment were sequestered and questioned individually. (R. Vol. I at 41, 64-66, 127-57.) The record also reveals that when the trial court asked the venire whether anyone had prior knowledge about the facts of this particular case, several people answered affirmatively. However, when the trial court asked those people whether their prior knowledge would prevent them from being able to listen to the evidence in this case and base their verdict solely upon that evidence as introduced at trial, no one responded. (R. Vol. I at 42-43, 84-87, 125-27.) Thus, no further individualized questioning was conducted or required as to that particular publicity issue.
"`A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala. 1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).' Ex parte Land, 678 So.2d 224 (Ala.1996), cert. denied, [519] U.S. [433], 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
"`As the general rule, the decision whether to voir dire perspective jurors individually or collectively is in the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala. Cr.App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. *162 Hurley, 746 F.2d 725 (11th Cir. 1984).'"
Boyd v. State, 715 So.2d at 848-49, quoting Haney v. State, 603 So.2d at 402.
"Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, and it is within the trial court's discretion whether to allow such a request. Bell v. State, 475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Raines v. State, 429 So.2d 1104 (Ala.Cr.App.), aff'd, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983)."
Hallford v. State, 548 So.2d 526, 538 (Ala. Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989) (emphasis added.) See also Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), aff'd on return to remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
A complete review of the voir dire indicates that the method of the examination and the precautions taken by the trial court "provided reasonable assurance that prejudice would have been discovered if present." Haney v. State, 603 So.2d at 402. We view these precautionary measures implemented by the trial court under its discretion as an effort to limit the possibility of prejudice. See Fletcher, 291 Ala. 67, 277 So.2d 882 (1973). The questioning that was conducted by the state, by Broadnax's counsel, and by the trial court afforded the potential jurors ample opportunity to voice their opinions as to issues both of capital punishment and of pre-trial publicity. We note that Broadnax does not allege any specific instance when a veniremember's response during voir dire may have "tainted" the venire. Moreover, the trial court, through its allowance of further, individualized questioning when necessary, allowed counsel plenty of opportunity to explore those opinions. Having made adequate concessions for detailedÔÇö and when necessary, individualizedÔÇöquestioning, the trial court properly denied Broadnax's pre-trial motion for individual voir dire.

VIII.
Broadnax argues that the trial court improperly granted the State's challenges for cause of certain jurors. (Issue XVIII in Broadnax's brief to this Court.) The record indicates that the trial court granted six of the state's challenges for cause. A review of the individual questioning of the jurors regarding their views of capital punishment indicates that these potential jurors stated that they would not be able to put aside their personal views or religious beliefs and follow the law in a case involving the death penalty.
"`A prospective juror may not be excluded from a capital case for personal opposition to the death penalty unless the juror's beliefs would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (footnote omitted). On the other hand, "[a] venire member who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). Accord, Bracewell v. State, 506 So.2d 354, 358 (Ala.Cr.App.1986).'
*163 "Kuenzel v. State, 577 So.2d 474, 484-85 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"`The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.

"`A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. "A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion." Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).'
"Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). `[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror.' Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990)."
Taylor v. State, 666 So.2d at 46-47.
Each of the six potential jurors who the state challenged for cause stated that their opposition to the death penalty would not allow them to put their personal views aside and follow the law. Each potential juror clearly indicated that he or she would not be able to fairly perform his or her duties as a juror. The record supports the trial court's granting the state's challenges for cause with regard to these potential jurors. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

IX.
Broadnax contends that the trial court erred in allowing the indictment to be read before the jury, in informing the jury that the district attorney had signed the indictment, and in allowing the indictment to be sent to the jury room during the jury's deliberation of this case. (Issue XIV in Broadnax's brief to this Court.) He argues that each of these events prejudiced him before the jury.
Initially, we note that Broadnax did not object to any of the instances where the state read the indictment to the jury, when the trial court informed the jury that the indictment had been signed by the district attorney, or when the indictment was sent to the jury room during its deliberations. Therefore, because he did not properly preserve these contentions, we are limited *164 to reviewing this issue for plain error. Rule 45A, Ala.R.App.P.
In Boyd v. State, supra, we addressed this same issue, stating:
"[T]he district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney. This Court stated:
"`Despite the appellant's argument to the contrary, there was no implication by the prosecutor in this case that he believed the appellant to be guilty and, therefore, was prosecuting the case. The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the prosecutor's acknowledgment that he signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility.'
"Arthur, 711 So.2d at 1054."
715 So.2d at 841-42.
The record reveals that the trial court first read the indictment to the potential jurors before the attorneys conducted voir dire in an attempt to see if any potential jurors had any prior knowledge of the matters alleged in the indictment. (R. Vol. III at 16.) When the trial court concluded reading the indictment aloud, it stated that the document was signed by the district attorney. (R. Vol. III at 18.) We conclude that as was the case in Boyd, the reading of the indictment and the notation that the district attorney had signed the document were both narrated to the jury as statements of fact. We, therefore, reject Broadnax's claims of error.
After the jury had begun its deliberations, it requested that the trial court send the indictment back to the jury room because the jurors needed the indictment to differentiate between the counts alleged in the four verdict forms. (R. Vol. VIII at 297.) Broadnax did not object when the trial court granted the request. (R. Vol. VIII at 298.) We have reviewed the four verdict forms contained in the record; we note that each form merely states that the jury has determined that Broadnax is guilty as charged in "Count ___" of the indictment. (R. Vol. I at 108-11.) Because these forms do not themselves differentiate between the charges against Broadnax in the different counts in the indictment, we can understand the jury's confusion and consequent need to examine the actual indictment. Thus, we conclude that the trial court did not commit plain error in sending the indictment back to the jury room at the jury's request.
Moreover, the risk that the trial court erred by allowing the jury to have the indictment during deliberation is lessened when the trial court instructs the jury that the indictment is not evidence in the case. Wiggins v. State, 347 So.2d 543 (Ala.Cr.App.1977). When the trial court began to charge the jury, it instructed it that Broadnax was clothed with the presumption of innocence, despite the crimes with which he was charged in the indictment. (R. Vol. VIII at 253.) Furthermore, the trial court instructed:
"[T]he fact that this indictment was returned by a grand jury is not a circumstance to be considered against the defendant. This indictment is merely the means by which this prosecution was brought into court and it states, on the one hand, the formal charge that's *165 brought against the defendant. And it advises him of those charges that he will be called upon to defend against at the time that this case is reached for trial.
"Now, to these charges that are set out in this indictment the defendant has entered a plea of not guilty. And in legal terminology, this puts the issue at bar, and these are the issues we are trying to resolve by the trial of this case.
"The charges of capital murder as set out in Counts 1, 2, 3, and 4, of the indictment, on the one hand, and his plea of not guilty on the other.
"As jurors, you are the triers and the finders of the facts in this case from the evidence. And in determining and deciding the guilty or the innocence of this defendant, you are confined to the evidence that has been presented to you in the form of testimony from this witness stand to my immediate right, plus any exhibits that were introduced into evidence."
(R. Vol. VIII at 256-57.) The trial court then again read the indictment to the jury, specifically setting out the different counts with which Broadnax was charged. (R. Vol. VIII at 265-68.) We conclude that the trial court made clear, through its instructions, that the indictment was not to be considered as evidence against Broadnax and that the charges contained in it should not have weighed into its deliberation of the evidence presented in court. See Wiggins, supra. Jurors are presumed to follow the trial court's instructions. See Perkins v. State, 808 So.2d 1041 (Ala.Cr. App.1999); Holland v. State, 588 So.2d 543 (Ala.Cr.App.1991). Thus, in light of these specific instructions, we conclude that the trial court did not commit plain error in reading the indictment to the jury, in telling the jury that the document had been signed by the district attorney, or in sending the indictment to the jury room upon its request.

X.
Broadnax maintains that the trial court erred in admitting into evidence three statements he made to law enforcement officers. (Issue IV in Broadnax's brief to this Court.)
The record indicates that Broadnax has raised this issue for the first time on appeal. Thus, we will review this issue under the plain-error standard. Rule 45A, Ala.R.App.P.

A.
Broadnax asserts that he should have been informed during his initial interview of his rights, pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, he argues that the interview with Vince Cunningham, an investigator with the Birmingham Police Department, at a work release center was a custodial interrogation and that he was not advised of his Miranda rights before the interview.
In Hooks v. State, 534 So.2d 329 (Ala.Cr. App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989), this Court stated:
"Miranda warnings are not necessarily required to be given to everyone whom the police question. Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). Miranda is only applicable when an individual is subjected to custodial interrogation. Davis v. Allsbrooks, 778 F.2d 168, 170 (4th Cir.1985); Primm v. State, 473 So.2d 1149, 1158 (Ala.Crim.App.), cert. denied, 473 So.2d 1149 (Ala.1985). `By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his *166 freedom of action in a significant way.' Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612.
"There is a distinction which must be made between general interrogation and custodial interrogation since Miranda is inapplicable when interrogation is merely investigative rather than accusative. Kelley v. State, 366 So.2d 1145, 1148 (Ala.Crim.App.1979); Primm, supra, at 1158; Johnston v. State, 455 So.2d 152, 156 (Ala.Crim.App.), cert. denied, 455 So.2d 152 (Ala.1984). This distinction should be made on a case-by-case basis after examining all of the surrounding circumstances. United States v. Miller, 587 F.Supp. 1296, 1299 (W.D.Pa.1984); Johnston, supra, at 156; Warrick v. State, 460 So.2d 320, 323 (Ala.Crim.App. 1984); Hall v. State, 399 So.2d 348, 351-52 (Ala.Crim.App.1981); Kelley, supra at 1149."
534 So.2d at 347-48 (Ala.Cr.App.1987). See State v. Smith, 715 So.2d 925 (Ala.Cr. App.1998).
In deciding whether the questioning of a suspect is a custodial interrogation, the following factors should be considered:
"`(1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. United States v. Crisco, 725 F.2d 1228, 1231 (9th Cir.), cert. denied, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).'"
Hooks v. State, 534 So.2d at 348 (some citations omitted), quoting United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985). See also State v. Smith, 715 So.2d at 927.
In Click v. State, 695 So.2d 209 (Ala.Cr. App.1996), cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997), this Court stated:
"It is well established that `the prosecution may not use statements, whether exculpatory or inculpatory, of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). However, the safeguards required by Miranda are required only if the defendant is in custody when questioned. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); Landreth v. State, 600 So.2d 440, 444 (Ala.Cr.App.1992).
". . . .
"Also, the fact that the questioning occurred at the police station does not necessarily lead to a conclusion that appellant was in custody for Miranda purposes.
"`[P]olice officers are not required to administer Miranda warnings to everyone they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'
"Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)."
695 So.2d at 216-17.
Additionally, courts in other jurisdictions have addressed whether questioning an inmate is a custodial interrogation. A prison inmate is not automatically in "custody" within the meaning of Miranda. United States v. Conley, 779 F.2d 970, 972-73 (4th Cir.1985), cert. denied, 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986). "For Miranda purposes, custody does not exist unless a public official questions *167 the defendant `in a context where [the defendant's] freedom to depart [is] restricted.'" Garcia v. Singletary, 13 F.3d 1487, 1492 (11th Cir.), cert. denied, 513 U.S. 908, 115 S.Ct. 276, 130 L.Ed.2d 193 (1994), quoting United States v. Conley, 779 F.2d 970 (4th Cir.1985), cert. denied, 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986) (citations omitted); see also U.S. v. Menzer, 29 F.3d 1223, 1230-32 (7th Cir.), cert. denied, 513 U.S. 1002, 115 S.Ct. 515, 130 L.Ed.2d 422 (1994); State v. Owen, 1 Neb.App. 1060, 510 N.W.2d 503 (1993). In order to determine whether a reasonable person would believe that his freedom had been diminished, the following factors must be considered: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which prison officials confronted the individual with evidence of his guilt; and (4) whether officials exerted any additional pressure to detain the individual. Garcia v. Singletary, 13 F.3d at 1490, citing Cervantes v. Walker, 589 F.2d 424 (9th Cir.1978). In making the distinction between custodial and noncustodial interrogation, the most compelling question is whether the focus of the investigation has finally settled on the defendant. C. Gamble, McElroy's Alabama Evidence,  201.02 (5th ed.1996).
At trial, Cunningham testified that, on April 26, 1996, he went to the work release center in Alexander City and spoke to Broadnax about the last time Broadnax saw his wife. Cunningham stated that the interview was conducted in a large conference room, and that another law enforcement officer was present during the interview. According to Cunningham, Broadnax was not a suspect at that time and he was free to leave the interview. Cunningham testified that Broadnax talked to him voluntarily, that he answered in a coherent manner, and that no threats, promises, or inducements were made to him. Cunningham stated that Broadnax told him that Jan and DeAngelo visited him at his workplace on April 25 around 6:30 p.m. and that they left around 8:20 p.m. Additionally, Cunningham stated that Broadnax indicated that he telephoned his brother around 9:00 p.m., and that he telephoned Jan around 10:00 p.m.
Given that Cunningham testified that Broadnax was not a suspect, that the focus of the investigation had not centered on him, that he was free to leave the interview, that he spoke in a coherent manner, and that no threats, promises, or inducements were made for him to give a statement, the evidence indicates that the interview between Cunningham and Broadnax was not a custodial interrogation and that Broadnax's statement was voluntary. Thus, there was no plain error in the admission of Broadnax's initial statement.

B.
Broadnax argues that his second statement to Cunningham should not have been admitted because, he says, the statement was not voluntary. Specifically, he argues that when he refused to sign the waiver-of-rights form, he essentially was invoking his right to remain silent.
"The Miranda right to counsel attaches only when a suspect invokes his right during custodial interrogation." Coral v. State, 628 So.2d 954, 973 (Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). "[T]he failure of the defendant to sign a written waiver form does not invalidate an otherwise valid waiver." Sabiar v. State, 526 So.2d 661, 667 (Ala.Cr.App.1988), citing Inzer v. State, 447 So.2d 838 (Ala.Cr.App.1983).
Cunningham testified that Broadnax was taken into custody and was transported from the Alexander City Work Release *168 Center around 4:30 p.m. on April 29, 1996.[5] Cunningham further testified that, in an office at the Birmingham Police Department building around 7:00 p.m. on April 29, Broadnax made a statement. Cunningham stated that before Broadnax made the statement he read him his Miranda rights. According to Cunningham, although Broadnax refused to sign the waiver-of-rights form, he did not indicate that he wanted a lawyer. Additionally, Cunningham testified that Broadnax indicated that he wished to talk to him. The record does not reveal the content of the statement.
In this case, Cunningham testified that he read Broadnax his Miranda rights, that Broadnax indicated that he wished to speak to him, and that he did not request a lawyer. Because there is no evidence that Broadnax's Miranda rights were violated, the admission of the statement did not rise to the level of plain error. Additionally, because the content of the statement was not admitted into evidence, any error in the admission of testimony mentioning the circumstances surrounding the statement did not contribute to the verdict. Thus, any error in referring to the second statement was harmless. See Coral v. State, 628 So.2d at 973; Rule 45A, Ala.R.App.P.

C.
Broadnax argues that his third statement, in which he stated that he sold his work boots a year ago to a white man and that his uniform had been missing for several months, was not voluntary.
In Hyde v. State, supra, this Court stated:
"Although extrajudicial confessions are prima facie involuntary, this court discussed the showing necessary for a trial court to determine whether a confession in voluntary in Johnson v. State:

"`"For a confession to be admissible, the state must present evidence that the defendant was informed of his Miranda rights and that the confession was voluntarily given." Mann v. State, 581 So.2d 22, 23 (Ala.Cr.App. 1991).'
"680 So.2d 1005, 1007 (Ala.Cr.App.1996).
"`"In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala.Cr.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence. `"The test for the voluntary nature of an extrajudicial confession or inculpatory statement is whether in light of all the surrounding circumstances, the statement was free from inducement, threat or promise, either expressed or implied, which would have produced in the mind of the accused any fear of harm or hope of favor."' Seawright, 479 So.2d at 1367, citing Rogers v. State, 365 So.2d 322 (Ala.Cr.App.), cert. denied, 365 So.2d 334 (Ala.1978)."
"`Dixon v. State, 588 So.2d 903, 907 (Ala.1991).'
"Howard v. State, 678 So.2d 302, 306 (Ala.Cr.App.1996)."
778 So.2d at 225-26.
Cunningham testified that Broadnax made a statement to him around 2:30 p.m. on May 2, 1996, and that Broadnax was arrested that same day. We are unable to determine from the record whether Broadnax made the statement before or after he was arrested for the murders. Cunningham stated that he read Broadnax his *169 Miranda rights and that Broadnax signed a waiver-of-rights form before making the statement. (R. Vol. II at 367.) According to Cunningham, Broadnax did not invoke his rights during the interview, and no threats, promises or inducements were made in an effort to coerce Broadnax into giving a statement. Cunningham testified that it appeared that Broadnax understood his constitutional rights and that he voluntarily made the statement.
Given that Cunningham testified that he read Broadnax his rights before Broadnax made the statement, that he signed a waiver of rights form, that he appeared to understand his constitutional rights, and that he was neither threatened nor promised anything in exchange for his statement, the evidence indicates that Broadnax's statement was voluntary. Thus, the admission of the statement did not constitute plain error. Rule 45A, Ala.R.App.P.

D.
Additionally, Broadnax contends that the trial court erred in failing to hold a suppression hearing concerning the admission into evidence of the three statements.
In Nettles v. State, 731 So.2d 626 (Ala. Cr.App.1998), this Court stated:
"The procedure for determining the voluntariness of confessions has been well-settled for over 30 years. The Alabama Supreme Court first outlined the procedure in Duncan v. State, 278 Ala. 145, 176 So.2d 840 (Ala.1965), in response to the United States Supreme Court's mandate in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). In Duncan, the Court set out the following procedure:
"We are clear to the conclusion that whenever a motion is made for the question of the voluntariness of a confession to be determined outside the presence of the jury, the motion should be granted. In such a hearing, the trial judge sitting alone should make a determination upon a proper record of the issue of voluntariness. At such a hearing, the defendant may take the stand and testify for the limited purpose of making a record of his version of the facts and circumstances under which the confession was obtained."
731 So.2d at 630. (Emphasis added.)
The clerk's record does not contain a motion to suppress the statements or a request for a suppression hearing. Additionally, our review of the record reveals that Broadnax did not object at trial to any failure of the court to hold a suppression hearing.
Given that our review of the trial record indicates that testimony concerning the three statements was properly admitted, any error in failing to hold a suppression hearing did not substantially prejudice Broadnax and did not rise to the level of plain error. Rule 45A, Ala.R.App.P.

XI.
Broadnax claims that the trial court erred by admitting certain items into evidence before the state established a proper chain of custody. (Issue XIII in Broadnax's brief to this Court at p. 77.) Broadnax did not object to the admission of these items into evidence at trial; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
Section 12-21-13, Ala.Code 1975, states:
"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of *170 evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
Additionally,
"`"`The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.' Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Cr.App. 1992); Smith v. State, 583 So.2d 990 (Ala.Cr.App.1991), cert. denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Cr.App.1990), rev'd, 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Cr.App.), appeal after remand, 591 So.2d 149 (Ala.Cr.App. 1991); Shute v. State, 469 So.2d 670, 674 (Ala.Cr.App.1984)."'
"Arthur v. State, 711 So.2d 1031, 1048 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), quoting Slaton v. State, 680 So.2d 879, 893 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). See also, Williams v. State, 505 So.2d 1252 (Ala.Cr.App. 1986), aff'd, 505 So.2d 1254 (Ala.1987). Finally, `evidence that an item has been sealed ... is adequate circumstantial evidence to establish the handling and safeguarding of the item.' Lane v. State, 644 So.2d 1318, 1321 (Ala.Cr.App. 1994)."
Perkins v. State, 808 So.2d at 1102.
Because of the way this issue is presented in his brief to this Court, we seriously question Broadnax's sincerity in making this argument. Broadnax merely cites to three pages in the record where, he claims, the state did not establish through the testimony of Officer Bill Persons, an evidence technician with the Birmingham Police Department, a proper chain of custody for the admission of certain items into evidence.[6] Broadnax does not specifically state in his brief to this Court which items of evidence should not have been admitted. In addition, Broadnax does not explain how he was prejudiced by the introduction of this evidence. In light of  12-21-13, Ala.Code 1975, and absent a showing by Broadnax regarding which evidence should not have been admitted, the reasons why that evidence was inadmissible, and the prejudice he suffered because of its admission, we refuse to conclude that plain error occurred.
Broadnax, however, specifically argues that the trial court erred by admitting into evidence an earring similar to the earring found in Jan's vehicle. Persons recovered the earring from Officer Whaley of the Alexander City Police Department. According to Broadnax, because Whaley did not testify at trial, a link in the chain of custody is missing. We disagree.
*171 Pernell Cotney, a supervisor at Welborn, identified the earring at trial. He stated that he had received it from two other Welborn employees who had found it at the plant. Cotney testified that he turned the earring over to Whaley. Persons testified he received the earring from Whaley.
The chain of custody for an item of evidence does not begin at the time of the crime, but at the time the item comes into the state's possession. Burrell v. State, 689 So.2d 992 (Ala.Cr.App.1996). In addition, "`[c]hain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves.'" Ex parte Scott, 728 So.2d 172, 182 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999), quoting Magwood v. State, 494 So.2d at 144.
Although Whaley did not testify, we find no plain error in the trial court's admission of the earring into evidence. The earring was identified by Cotney as the earring he turned over to Whaley. Persons identified the earring as the one he received from Whaley. The failure of Whaley to testify is at worst a weak link in custody and does not require reversal. See Pou v. State, 557 So.2d 1314 (Ala.Cr.App.1989).
Broadnax also claims that the state failed to establish a chain of custody regarding two pieces of blue fabric. The state admitted into evidence photographs of blue fabric found at the crime scene in Birmingham. The state also admitted into evidence samples of blue fabric, similar to the fabric in the photographs, seized from Welborn. Persons identified the two pieces of blue fabric at trial stating that they were the pieces of fabric he had personally collected at Welborn Forest Products. He further testified that the pieces of fabric had not changed since they had come into his possession. Therefore, there is no missing link in the custody of the pieces of fabric and Broadnax's argument is without merit.
Broadnax claims that a soil sample collected from Welborn was improperly admitted because, he says, a link in the chain was missing. Persons testified that he collected the soil sample. Persons testified that he took the sealed sample to the Alabama Department of Forensic Sciences (hereinafter "DFS") for analysis. When asked if the exhibit had changed since he had taken it to DFS, Persons stated:
"The only changes are Angelo's signature on the seal showing me that he has opened it and analyzed it."
(R. Vol. IV at 325.)
In addition, Angelo Dellamanna, a scientist with DFS, testified he had received the soil sample, analyzed it, resealed it and returned to the police. Based on the testimony of Persons and Dellamanna, the state adequately established the chain of custody of the soil sample.
Broadnax further claims that the chain of custody as to the samples of Jan and DeAngelo's blood was never established. Dr. Brissie testified that he withdrew blood and other fluids from Jan and DeAngelo's bodies during the autopsies. According to Dr. Brissie, he gave the samples to one of his deputy coroners to be transferred to DFS. Dellamanna testified that he had received the blood samples of Jan and DeAngelo from Deputy Coroner Jack Parker. There was no testimony that the samples received by Dellamanna were altered or damaged. Therefore, at worst, the failure of Parker to testify constituted a weak link in the chain of custody. We find no plain error.
While conducting our plain-error review pursuant to Rule 45A, Ala.R.App. P., we note that the trial court did not instruct the jury, pursuant to  12-21-13, Ala.Code 1975, about any breaks in the *172 chain of custody of physical evidence. However, based on the foregoing analysis, we conclude that error in the omission of such an instruction, if any occurred, did not rise to the level of plain error.
"In Hyde v. State, 778 So.2d 199 (Ala.Cr. App.1998), we stated the following regarding plain-error review:
"`"The Alabama Supreme Court has adopted federal case law defining plain error, holding that `"plain error" only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983)(quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981))."
"`Haney v. State, 603 So.2d 368, 392 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations. United States v. Young, 470 U.S. 1, 16-17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1, 13 n. 14 (1985). Finally, a failure to object will weigh heavily against a claim of prejudice. Williams v. State, 601 So.2d 1062, 1066 (Ala.Cr.App. 1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). See also Brooks v. State, 695 So.2d 176 (Ala.Cr. App.1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997).'"
Perkins v. State, 808 So.2d at 1093-94.
We conclude that the trial court's failure to instruct the jury about any breaks in the chain of custody of the evidence did not seriously affect the fairness or integrity of the judicial proceeding.

XII.
Broadnax contends that the trial court erred by admitting into evidence an expert witness's testimony about the results of DNA testing without first determining the admissibility of the evidence in a hearing held outside the presence of the jury. (Issue VII in Broadnax's brief to this Court.) He further argues that the trial court erred by admitting the testimony because, he says, the results were "incompetent and unreliable." (Broadnax's brief to this Court at p. 44.) Broadnax neither requested a hearing outside the jury's presence nor objected to the admission of the DNA testimony on this ground; therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
Evidence was presented at trial that the DNA in a bloodstain found on a work shirt issued to Broadnax "matched" the DNA in Jan's blood and that the DNA in a bloodstain found on a pair of work pants issued to Broadnax "matched" the DNA in the blood of DeAngelo. According to the testimony concerning the "match" with Jan's blood, the probability of finding similar DNA was 1 in 4,447,000,000 African-Americans and 1 in 33,000,000,000 Caucasians. With regard to the "match" with DeAngelo's blood, the probability of finding similar DNA was 1 of 583,000,000 African-Americans and 1 of 3,825,000,000 Caucasians.
Broadnax argues that the trial court erred reversibly in not holding a hearing outside the presence of the jury to determine the admissibility of the DNA evidence. In Payne v. State, 683 So.2d 440, 455 (Ala.Cr.App.1995), aff'd, 683 So.2d *173 458 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997), this Court held that the trial court did not err reversibly in not conducting an admissibility hearing outside the presence of the jury because Payne had not requested such a hearing. Indeed, it was Broadnax's responsibility to request the hearing. Because he did not, we conclude that the trial court did not commit plain error by not sua sponte conducting a hearing to determine the admissibility of the DNA evidence. See Simmons v. State, 797 So.2d 1134 (Ala.Cr.App.1999).
Moreover, in this case, there is absolutely no implication of error, plain or otherwise, with regard to the admission of the DNA evidence. Broadnax argues that the results of the DNA testing do not meet the requirements of admissibility as set forth in Ex parte Perry, 586 So.2d 242 (Ala. 1991), Ex parte Hutcherson, 677 So.2d 1205 (Ala.1996), and Turner v. State, 746 So.2d 355 (Ala.1998). At the time of Broadnax's trial,  36-18-30, Ala.Code 1975, provided the standard by which Alabama courts determined the admissibility of DNA evidence. Section 36-18-30, Ala. Code 1975, provides:
"Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, ..., decided on June 28, 1993."
As this Court stated in Simmons v. State, supra, guidance as to how this statute should be interpreted in Turner, supra.
"In Turner, the Alabama Supreme Court held:
"`[I]f the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to  36-18-30, determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
"`I. Are the theory and the technique (i.e., the principle and the methodology), on which the proffered DNA forensic evidence is based "reliable"?
"`II. Are the theory and the technique, (i.e., the principle and the methodology), on which the proffered DNA evidence is based "relevant" to understanding the evidence or to determining a fact in issue?
"`Trial courts should use the flexible Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ], analysis in making the "reliability" (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.
"`Trial courts should make the "relevance" assessment by addressing the "fit" between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence *174 that is otherwise reliable and relevant be deemed inadmissible.
"`Of course, once a particular theory or technique has satisfied  36-18-30, a court may take judicial notice of that theory or technique's reliability. See Perry, 586 So.2d [242] at 251 [ (Ala. 1991)]; [United States v.] Beasley, 102 F.3d [1440] at 1448 [ (8th Cir.1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997) ] (holding that reliability of the polymerase chain reaction ("PCR") method of DNA typing would be subject to judicial notice in future cases); [United States v.] Martinez, 3 F.3d [1191] at 1197 [ (8th Cir. 1993), cert. denied, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994) ] (holding that the reliability of the restriction fragment length polymorphism ("RFLP") procedure was subject to judicial notice). We recognize that the state of scientific theories and the techniques for producing DNA evidence is not static, and that the scientific community undoubtedly will produce new theories and techniques regarding DNA. Each new theory and technique will be subject to the test set out above until its reliability warrants judicial notice.'
"746 So.2d at 360-61 (footnotes omitted.)."
Simmons v. State, 797 So.2d at 1144-45.
At Broadnax's trial, the state offered DNA evidence and DNA population frequency statistical evidence to establish that the DNA in bloodstains found on the work clothes issued to Broadnax matched the DNA in the blood of Jan and DeAngelo. This evidence permitted the inference that Broadnax participated in the offenses. The record reflects that Dellamanna testified that he performed DNA analyses on the blood samples of Jan, DeAngelo, and the stains found on the work clothes issued to Broadnax. According to Dellamanna, the method of DNA analysis he performed is used by the DFS to determine whether two DNA samples match. He testified that the theory and technique used by the DFS's Birmingham DNA laboratory was generally accepted and was considered reliable by its scientific community. Moreover, Dellamanna testified that the type of DNA analysis he performed had been extensively published, subjected to peer review, and admitted into evidence in numerous courts of law. He explained the controls built into the testing process to further ensure the test's reliability and testified that his results in this case indicated no error or contamination. Dellamanna's testimony adequately established the reliability of the DNA analysis.
We reject Broadnax's argument that because Dellamanna did not state the name of the particular method of DNA analysis performedÔÇöeither PCR or RFLPÔÇöthe theory and technique of the method of DNA analysis testified to in his trial was unreliable. Based on the record before us, we are convinced that the jury had enough information before it to determine the reliability of the DNA analyses and the weight to be given the evidence. The failure of testimony to name the DNA method used goes to the weight of the evidence, not its admissibility. Moreover, the Alabama Supreme Court in Turner took judicial notice of the reliability of the theory and techniques used in the restriction fragment length method of DNA analysis. In Simmons v. State, supra, this Court took judicial notice of the reliability of the polymerase chain reaction method of DNA analysis. Both methods are considered to be reliable for admission into evidence in the courts of Alabama. While Broadnax argues that another method of analysis may have been performed by Dellamanna, he offers only bare allegation in *175 support of his argument. We refuse to conclude that the method of DNA analyses used in this case was unreliable based on speculation and conjecture.
Additionally, the state established that the DNA evidence was relevant to determine a fact in issue, i.e., whether Broadnax had contact with Jan and DeAngelo and whether he participated in the offenses. Dellamanna testified that he analyzed the blood samples from Jan and DeAngelo and the bloodstains found on a pair of boots and a work uniform issued to Broadnax. Broadnax's defense attempted to establish that it was not possible for Broadnax to have committed the offenses the state alleged he had committed. Dellamanna's testimony that the DNA in the blood from Jan and DeAngelo matched the DNA in the bloodstains found on Broadnax's clothing was relevant to show that Broadnax participated in the offenses.
Because the record adequately establishes that the method of DNA analysis performed in this case is reliable and that the evidence provided by the analysis was relevant, the trial court committed no error, plain or otherwise, in admitting the evidence.
Furthermore, the trial court did not err in admitting into evidence DNA population frequency statistical evidence. Dellamanna testified that DNA population frequency statistical analysis evidence is used by the DFS to determine the frequency of a particular DNA profile in the population of various races. He further testified that the method he used in calculating the population frequency statistics in this case is commonly used in the scientific community. He stated that he performed the required controls in the calculation of the population frequency statistics, including a technical review by another scientist, to assure the accuracy of the results. According to Dellamanna, no errors were found in the calculation of the population frequency statistics in this case. This Court has found population frequency statistics evidence reliable in numerous cases. See Thomas v. State, 824 So.2d 1 (Ala.Cr.App.1999); Williams v. State, 795 So.2d 753 (Ala.Cr.App.1999); Hammonds v. State, 777 So.2d 750 (Ala. Cr.App.1999); and Maples v. State, supra.
Because the trial court had before it evidence regarding the reliability and the relevance of the population frequency statistic evidence, we conclude no plain error occurred in allowing that evidence to be submitted to the jury for its consideration.

XIII.
Broadnax maintains that the trial court erred in permitting a coroner and a forensic scientist to testify concerning matters that were, he says, outside their field of expertise. (Issue XII in Broadnax's brief to this Court.) Specifically, he argues the trial court should not have permitted Ronnie Williams and Angelo Dellamanna to testify concerning blood spatters found at the crime scene.
Our review of the record indicates that, although defense counsel timely objected to Dellamanna's testimony, he did not object to Williams's testimony concerning the blood spatters. Thus, we will review Williams's testimony for plain error. Rule 45A, Ala.R.App.P. Additionally, we will address whether the trial court abused its discretion in admitting Dellamanna's testimony concerning the blood spatters. See Holland v. State, 666 So.2d 547, 549 (Ala. Cr.App.1995).
Rule 702, Ala.R.Evid., states:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, *176 experience, training, or education, may testify thereto in the form of an opinion or otherwise."
"`[A]ny objection to an expert witness on the ground that he or she lacks knowledge goes to the weight rather than to the admissibility of his or her testimony.'" Holland v. State, 666 So.2d at 548, quoting Smoot v. State, 520 So.2d 182, 189 (Ala.Cr.App.1987). See also Smith v. State, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Whether a witness will be allowed to testify as an expert is largely discretionary and the trial court's decision will not be disturbed "except for palpable abuse." Holland v. State, 666 So.2d at 549, quoting Sharp v. Argo-Collier Truck Lines Corp., 356 So.2d 147 (Ala.1978).
In this case, Williams testified that during his 14 years as a Jefferson County Deputy Coroner he attended various schools on crime scene investigation and had received special training in interpreting bloodstain and blood drops. Because Williams had 14 years' experience and training, the trial court did not abuse its discretion by admitting the expert testimony. See Robinson v. State, 574 So.2d 910 (Ala.Cr.App.1990) (holding that trial court did not abuse its discretion in admitting expert testimony of coroner who had 15 years' experience performing blood spatter analysis). Furthermore, given that Williams testified that he received training on bloodstain interpretation, we conclude that the admission of Williams's testimony did not seriously affect the substantial rights of Broadnax and rise to the level of plain error. Rule 45A, Ala. R.App.P.
Additionally, Dellamanna testified that he had completed training workshops on the interpretation of bloodstains held by the FBI Academy and the International Association of Bloodstain Pattern Analysis. Defense counsel objected to Dellamanna's testifying about blood spatters on the ground that the testimony was beyond his field of expertise. The trial court determined that, because of Dellamanna's training, he was qualified to testify, and it overruled the objection. Based on the record before us, we conclude that the trial court did not abuse its discretion in determining that, based on Dellamanna's training, he was qualified to testify concerning his interpretation of the blood spatters.
No error occurred in the admission of the expert testimony of Williams and Dellamanna.

XIV.
Broadnax claims that the state withheld "critical evidence" in violation of Brady v. Maryland, supra. (Issue VIII in Broadnax's brief to this Court.) Specifically, Broadnax argues that the state withheld telephone records that "directly undermined the veracity of [the] statement that he gave to police." (Broadnax's brief to this Court at p. 50.)
In Williams v. State, supra, this Court stated:
"In Brady, 373 U.S. at 87, 83 S.Ct. at 1196-1197, the Supreme Court held that `the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' A Brady violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990); United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, *177 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983); Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)(plurality opinion by Blackmun, J.), defined the standard of materiality required to show a Brady violation as follows: `The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Stano v. Dugger, 901 F.2d at 899; Delap v. Dugger, 890 F.2d at 299; Coral v. State, 628 So.2d 954 (Ala.Cr.App.1992); Thompson v. State, 581 So.2d 1216 (Ala. Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Ex parte Womack. `When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within the general rule.' Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness."
710 So.2d at 1296-97.
After Broadnax's trial had commenced, the state provided defense counsel with telephone records that they intended to introduce into evidence to refute Broadnax's statement that he had called his brother around 9:00 p.m. on the evening of the murders. At a hearing challenging the admissibility of the records, the following occurred:
"THE COURT: ... You had one other motion this morning. What was that?
"[Defense counsel]: Judge, it relates to some phone records. We were presented some phone records, a number of pages by the [district attorney] this morningÔÇöor Ms. Petro and Mr. Cochran this morning.
"This is the first time that we have seen these records. I suppose they relate to phone calls that someone may have made, possibly our client. These records have been in existence, obviously, since the phone call was made. This is the first time that we have seen them. We were entitled to them, along with all the other discovery, way ahead of this time. We are here in the third day of trial, and we just get them. We had no time to look at them. I don't know what they say. I don't know how to read them. I have not had a chance to consult someone who would be able to read them and tell us what they mean and how to read them. And thus, we have not been able to prepare to defend against these.
"And so, we would ask the Court to exclude these, as well, on those grounds.
"THE COURT: What says the State on the phone records?
"[Prosecutor]: Judge, several things:

*178 "First, as to the relevance of the records. What the records will show is that the telephone call that Detective Cunningham testified [to] yesterday, that the defendant claimed to have made to his brother, Larry, up here in Birmingham, was not made or doesn't exist in the phone records. There is no record showing that call was ever made. So I think it is clearly relevant.
"As far as not being provided in the record, let me say a couple of things:
"First, the defense was provided a copy of their client's statement, which gave that information about the supposed phone call made, I think, some time ago. Of course, the ability to seek a subpoena as help to get those records, they were equally accessible to the defense.
"Also, I believe, as a matter of fact, [Ms.] Petro gave Mr. Brower those records. Earlier this week it showed that we had those records. I think he elected not to take a look at them at that point, but they were provided to the defense for the opportunity to look.
"And I think we've had an open file discovery policy, and that's been conveyed to the defense attorneys in this case. From the start of this case, those records have been in our files forÔÇö
"[Defense counsel]: Judge, as far as the records being provided to me, my recollection is that last Friday, in preparation for this trial, I went down to the District Attorney's office and talked to Ms. Petro in the lobby down there, and asked her about a couple of copies of statements that our defendant allegedly made that we hadn't got and a couple of other things. And because I had seen a copy of a subpoena for phone records in the file and discovery materials that she gave me, I asked her about that. She indicated that they had done them, but there wasn't anything to them. She also indicated to me that she had given Mr. Bender other discovery materials that day. I did not specifically request that she provide me with those records at that time. They have not been shown to me or provided to me this week. I was under the impression that if she was going to use them, she would have given them to Mr. Bender when she gave him the other materials that day.
"It may have been a mistake or impression on my part, or that she was not going to use the materials because they were of no value. And that's my recollection of the phone records here.
"[Defense cocounsel]: Judge, if I might add, when I picked up that material that Ms. Petro provided me on Friday, they did not included these records. We do understand that there is open file discovery in this case. But obviously, the Court knows that we can't go in their files; they have to give us what is in their files.
"So, we again move that these phone records be excluded form evidence in this trial.
"THE COURT: Well, I think since they were both equally available to both sides, even if the State did have them, they have provided them now. So I am going to overrule. And if they are properly authenticated and offered, then I will let them in.
"Anything else?
"[Defense cocounsel]: Yes, sir. We would like to have the Court note our exception.
"THE COURT: All right. I'll note your exception. Anything else before we give the jury a two-minute warning?
"[Prosecutor]: No, sir.

*179 "[Defense cocounsel]: No, sir, Judge."
(R. Vol. VII at 9-14.)
As the trial court noted, the phone records were equally available to Broadnax and the state; therefore, we fail to see how the state suppressed the evidence. Moreover, as the state points out in its brief to this Court, the phone records were used to attack the veracity of Broadnax's statement given to law enforcement officers. The phone records were not used to attack the credibility of a defense witness. That being the case, there is no indication that the phone records would have been favorable to the defense. Furthermore, the phone records were not material because there is no reasonable probability that, had the state provided Broadnax with a copy of the records before trial, the result of the proceedings would have been different. As Broadnax emphasized on cross-examination of the state's witness who testified about the phone records, the records do not refute the possibility that Broadnax did telephone his brother but his brother did not answer. We conclude that no Brady violation occurred.

XV.
Broadnax claims that the prosecutor repeatedly engaged in misconduct that denied him a fair trial.[7] (Issues III and X in Broadnax's brief to this Court.)
"`In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).'
"Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Cr.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993). Finally,
"`"during closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr. App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). "In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must by judged on its own merits," Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted)(quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App. *180 1990), aff'd, 590 So.2d 369 (Ala. 1991). "In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury." Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citation omitted). "To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted." Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App. 1985) (citations omitted.)'"
"Coral v. State, 628 So.2d 954, 985 (Ala. Cr.App.1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994)."
Wilson v. State, 777 So.2d 856, 893-94 (Ala.Cr.App.1999).
With these principles in mind, we will address each of Broadnax's claims of prosecutorial misconduct.

A.
Broadnax claims that the state "incorrectly instructed the jury on the state's burden of proving guilt beyond a reasonable doubt" and "lowered the state's burden [of proof]." (Issue VI.B.ii. in Broadnax's brief to this Court at p. 41.)
Before conducting his voir dire examination, the prosecutor made the following comment to the jury:
"Now the burden of proof is just that. It's beyond a reasonable doubt. A doubt for which you the jury can give a good, sound, sensible reason. It's not a mystical doubt, it's not a magical doubt, it's not something you can pull from the sky, but it's a reasonable doubt."
(R. Vol. III at 48.)
Our review of the state's voir dire examination leads us to conclude that the prosecutor provided his "definition" of reasonable doubt to assist him in learning the veniremembers' opinions on the state's burden of proof. We do not find any plain error in this situation. Moreover, the trial court repeatedly instructed the jury that the comments and arguments of counsel were not the law and that they should follow only his instructions on the law. Thus, we find no plain error.

B.
Broadnax claims that the "prosecutor repeatedly solicited inadmissible and improper testimony." (Broadnax's brief to this Court at p. 71.)
Broadnax argues that during the direct examination of Teresa Jemison, a friend of Jan's, the prosecutor improperly elicited the following testimony:
"[Prosecutor]: Okay. Did you ever see the defendant come to y'all's church with Jan?
"[Jemison]: Yes.
"[Prosecutor]: All right. And what sort of image would he present when he came to church?
"[Jemison]: Well, he presented a good one."
(R. Vol. V at 406.) Broadnax failed to object at trial to the prosecutor's questions; therefore, our review is limited to plain error. Rule 45A, Ala.R.App.P.
While we agree with Broadnax that the prosecutor elicited opinion testimony from this witness, we fail to understand, and Broadnax does not show us, how the testimony was prejudicial or how allowing it denied him a fair trial. Therefore, we conclude no plain error occurred.
Broadnax argues that the prosecutor engaged in improper conduct during his direct examination of Janice McGee, Jan's neighbor and fellow church member. Broadnax alleges that error occurred during *181 the following portion of the examination:
"[Prosecutor]: Okay. What was Jan's reaction to that denial of parole?
"[McGee]: She was very disgusted because of some things that she found out that she did not know.
"[Prosecutor]: Okay. And what [were] her intentions at that point? What did she intend to do?
"[Defense counsel]: Objection, Judge. That wouldÔÇö
"THE COURT: Rephrase. Sustained as to the form of the question.
"[Prosecutor]: Did she tell you anything about her state of mind at that time and what she intended to do as a result of that?
"[McGee]: Yes, she did.
"[Prosecutor]: All right. What was that?
"[McGee]: She told me that she was very tired of the ripping and the running around. And that she was just tired. She wasÔÇö
"[Prosecutor]: All right. Did she tell you anything about her intentions?
"[McGee]: Yeah. She was through with it, because there wasn't nothing else that she could do.
"[Prosecutor]: What did you understand that to mean?
"[McGee]: Everything that she did didn't work compared to what he was telling her to do to get him out."
(R. Vol. V at 436-37.)
Our review of the record indicates that Broadnax elicited this same information during the cross-examination of Torita Kirkland. (R. Vol. V at 455-448.)
"If the evidence in question is inadmissible hearsay as urged by the defense, its admission was, at most, harmless error. Rule 45, Ala.R.App.P. `[T]estimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.' White v. State, 650 So.2d 538, 541 (Ala. Cr.App.1994).... `The erroneous admission of evidence that is merely cumulative is harmless error.' Dawson v. State, 675 So.2d 897, 900 (Ala.Cr.App. 1995)."
Flynn v. State, 745 So.2d 295, 307 (Ala.Cr. App.1999). Therefore, we conclude that, although McGee's testimony may have been inadmissible, the subsequent testimony elicited during Broadnax's cross-examination of Kirkland rendered any error in the admission of McGee's testimony harmless.
Broadnax claims that the trial court erred by allowing Kathy Chastain to testify regarding an out-of-court conversation she heard between her husband and Broadnax on the night of the offense. (R. Vol. XI at 562.) Any error in the admission of Kathy Chastain's testimony about the conversation was harmless.
Mark Chastain testified after Kathy Chastain. He testified about the conversation he had with Broadnax on the night of the murders. Thus, the testimony of Kathy Chastain was harmless in light of her husband's subsequent testimony. See Hammond v. State, 502 So.2d 843 (Ala.Cr. App.1986), cert. denied, 482 U.S. 917, 107 S.Ct. 3193, 96 L.Ed.2d 681 (1987)(holding any error in the admission of police officers' testimony was harmless in view of subsequent testimony eliciting same testimony). We find no reversible error.[8]
*182 In light of the substantial and independent overwhelming evidence of Broadnax's guilt, excluding the hearsay statements, we are convinced beyond a reasonable doubt that any error in the admission of the hearsay statements was harmless. Flynn v. State, supra; Hardy v. State, 804 So.2d 247 (Ala.Cr.App.1999); and Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

C.
Broadnax claims that the prosecutor improperly led its witnesses "[o]n several occasions ... in an effort to steer the testimony to meet the state's desired end." (Broadnax's brief to this Court at p. 72.)
"Whether to allow or disallow a leading question is within the discretion of the trial court, and except for a flagrant violation, will not be held to be reversible error. Jones v. State, 292 Ala. 126, 128, 290 So.2d 165, 166 (1974); Lawhorn v. State, 581 So.2d 1159 (Ala.Cr.App. 1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991); Ruffin v. State, 582 So.2d 1159 (Ala.Cr.App.1991); C. Gamble, McElroy's Alabama Evidence  121.05 (4th ed.1991)."
Ingram v. State, 779 So.2d 1225, 1264 (Ala. Cr.App.1999).
Broadnax argues that the prosecutor improperly led McGee when he asked her if Jan had told her that she was leaving Broadnax. Over defense counsel's objection, McGee answered in the negative. While the prosecutor's question may have been a leading question, we fail to see how Broadnax was prejudiced by McGee's answer.
The second instance of alleged error occurred during the prosecutor's direct examination of Baker. Broadnax did not object to any of the prosecutor's questions to Baker on the ground that they were leading; therefore, our review is for plain error. Rule 45A, Ala.R.App.P. While we agree with Broadnax that many of the prosecutor's questions were leading, we note that the objectionable questions mainly elicited foundation information and did not result in the introduction of inadmissible evidence. Broadnax has failed to show how he was prejudiced by the leading questions answered by Baker.
Thus, we conclude that none of the prosecutor's leading questions were so prejudicial to Broadnax to warrant reversal.

D.
Broadnax claims that the prosecutor improperly vouched for the strength of the state's case during its guilt-phase closing arguments. Broadnax cites the Court to five instances in the record where, he says, the prosecutor improperly expressed his personal opinion as to his guilt or vouched for the strength of the state's case.[9] Broadnax did not object to any of these alleged improper comments by the prosecutor; therefore, we review for plain error. Rule 45A, Ala.R.App.P.
According to Broadnax, during the prosecutor's closing argument in the guilt phase of his trial, he improperly argued that it was a "fact" that he killed Jan and DeAngelo, and that "most" of the charges were "not in dispute." (Broadnax's brief to this Court at p. 61.) We have reviewed this portion of the prosecutor's argument and conclude that Broadnax has misstated the prosecutor's argument. The prosecutor stated that it was an undisputed fact that DeAngelo was less than 14 years old, that Broadnax had been *183 convicted in 1978 for murder, and that two people were killed as a result of one course of conduct. The prosecutor then argued that he rejected Broadnax's alibi defense because his interpretation of the evidence supported a finding that Broadnax killed Jan and DeAngelo. It is not improper for the defense or the state to present any legitimate impressions from the evidence. Sanders v. State, 423 So.2d 348 (Ala.Cr. App.1982). The prosecutor was making a legitimate argument based on the evidence presented; we, therefore, find no plain error.
Broadnax claims that the following comments made by the prosecutor were improper:
"Well, ladies and gentlemen, if we prove to you that this man committed these despicable acts, [there] is no reasonable doubt. Because as [defense counsel] very thoroughly told you, that is one of the mainÔÇöthat is the main issue. That is the crux of this matter. And I think all four of the attorneys at this table can agree on that one thing. The only issue before you is who committed these heinous, gruesome, cruel acts. The State says there is no reasonable doubt, but that this man did those acts."
(R. Vol. VIII at 231.)
"`"[I]t is not improper for [the prosecuting attorney] to argue or to express his opinion that [the] accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence." 23A C.J.S. Criminal Law  1104, pp. 194-95 (1961).' Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App. 1986). In Galloway, a number of cases are cited in which the prosecuting attorney made comments stating his opinion that the appellant was guilty."
Henderson v. State, 584 So.2d 841, 857 (Ala.Cr.App.1988), remanded on other grounds, 584 So.2d 862 (Ala.1991).
Our review of the closing arguments indicates that the prosecutor was replying in kind to defense counsel's argument that Broadnax did not commit the murders based on his alibi and the unanswered questions raised by the evidence. See Chandler v. State, 615 So.2d 100, 110 (Ala.Cr.App.1992)(stating that the prosecutor has a right to comment on statements made by defense counsel in closing argument). Additionally, the prosecutor was merely arguing that the state had presented sufficient evidence for the jury to find that Broadnax had killed Jan and DeAngelo. It is not improper for the prosecutor to refer to the strength of the state's case. McWhorter v. State, 781 So.2d 257 (Ala.Cr. App.1999). We find no plain error.
Broadnax claims that the prosecutor improperly expressed her opinion when she stated that "[h]e's lying because he's guilty of murder." (R. Vol. VIII at 238.) The prosecutor made this comment immediately after she had paraphrased a portion of Broadnax's statement to the police in which he stated that the bloody uniform had been stolen and that he had sold the boots before the murders. After reading the comment in the context of the state's entire closing argument, we conclude that the prosecutor was offering her impressions of the information Broadnax gave police and the reason she believed Broadnax would lie. We find no error.
Additionally, Broadnax cites the Court to two additional places in the record wherein, he claims, the state improperly vouched for its case. Broadnax does not indicate what comments by the prosecutor he finds offensive. We have reviewed the prosecutor's argument on the pages cited by Broadnax and conclude that the state was merely arguing the strength of its *184 case and reiterating its interpretation of the facts. (R. Vol. VIII at 232, 250-251.) In light of Broadnax's failure to show how the prosecutor's argument might have prejudiced him and our review of the argument, we do not find plain error.
Furthermore, immediately before the closing arguments, the trial court stated to the jury:
"Nothing that you will hear from this point forward are you to consider as evidence. It would either be statements by counsel for the State or counsel for the defense."
(R. Vol. VII at 141.) We will presume that the jury followed the trial court's instructions. Whitehead v. State, 777 So.2d 781, 845 (Ala.Cr.App.1999).

E.
According to Broadnax, the prosecutor, during his first guilt-phase closing argument improperly shifted the burden of proof to him in the following portion of his argument:
"And he's got two fine attorneys. And what I want you to be thinking the whole time they're up here is: Are they giving me another reasonable explanation for all of this? Are they explaining this in a reasonable way? Does it make sense, or is it like that little boy with the cookie stains on his mouth saying that Martians beamed into the kitchen and took that bite out of the cookie? I mean, I don't know what their story is. Is it that this white guy that he supposedly sold these boots to a year before was picked up [as] a hitchhiker by Jan and killed her. And then, in the meantime, had broken into work release and stole some of his uniforms and then brought them back into work release, with his boots and uniforms and framed him? And if so, what is the person's motives? Look at whether they provide you with a reasonable explanation."
(R. Vol. VII at 161-62.) Broadnax did not object at trial to the prosecutor's comments; therefore, our review is limited to plain error. Rule 45A, Ala.R.App.P.
"`"This court, in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. See Duncan v. Stynchcombe, 704 F.2d 1213, 1216 (11th Cir.1983). Such prosecutorial misconduct, if `so pronounced and persistent that it permeates the entire atmosphere of the trial,' requires reversal. United States v. Alanis, 611 F.2d 123, 126 (5th Cir.), cert. denied, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980) (quoting United States v. Blevins, 555 F.2d 1236 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct.733, 54 L.Ed.2d 761 (1978)). Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. See Houston v. Estelle, 569 F.2d 372, 380 (5th Cir.1978). Additionally, prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence. See [In re] Winship, 397 U.S. [358,] at 364, 90 S.Ct. [1068,] at 1072[, 25 L.Ed.2d 368 (1970) ]. We reaffirm the former Fifth Circuit's position that `the limits of proper argument find their source in notions of fairness, the same source from which follows the right to due process of law.' Houston, 569 F.2d at 380."

*185 "`United States v. Simon, 964 F.2d 1082, 1086 (11th Cir.1992).'
"DeBruce v. State, 651 So.2d 599, 604 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994)."
Wilson v. State, 777 So.2d at 894.
After reviewing the state's closing argument in its entirety, we conclude that the state did not attempt to shift the burden of proof to Broadnax. There is no suggestion from the above-quoted argument that Broadnax had an obligation to produce any evidence or to prove his innocence. The prosecutor merely asked the jury to consider the evidence presented and to determine whether the evidence established reasonable doubt as to Broadnax's guilt. Moreover, the trial court, at the conclusion of the closing arguments, instructed the jury as to the state's burden of proof and Broadnax's presumption of innocence. Thus, we reject Broadnax's argument and conclude that no reasonable juror would have construed the state's comment to mean that Broadnax had any burden of proof. No plain error occurred.

F.
Broadnax claims that the prosecutor during her guilt-phase rebuttal argument improperly created "phantasmagorical conversations" between him and an investigator, and "erroneously invoked his own child" and Clint Eastwood to encourage the jury to convict him.[10] (Broadnax's brief to this Court at p. 68.) Broadnax did not object at trial to these prosecutorial comments; therefore, our review is for plain error. Rule 45A, Ala.R.App.P.
Our review of the record indicates that during the cited portions of the prosecutor's argument, the prosecutor paraphrased questions and answers from an interview between Broadnax and Cunningham in which Broadnax had attempted to explain the suspected blood found on his work boots and uniform. The prosecutor, arguing that Broadnax lied to police, stated:
"This man is obviously an accomplished liar, because that's all he told Vince Cunningham. And Vince Cunningham has been around the block. He knows when he's talking to this man trying to get just basic information on the death of his wifeÔÇöand be blurts out the last time I saw her was 8:20. And Vince already knew the body was found in Birmingham almostÔÇöat 9:00 o'clock, sometime around there.
"He tells VinceÔÇöhe's got an answer for everything. Blood on the uniform at the third interview: `Oh, Man, somebody had stolen my uniform, and I had let the uniform company know.' Well, what do we know? That's a lie.
"`Well, what about the blood on your boots, Donald?'
"`Oh, I sold those to a white guy about a year ago.'
"An answer for everything. And we know that it is all one big lie.
"Is he lying just because for some reason he left the work release center to go and have a drink or to go and do something else? Absolutely not. He's lying because he's guilty of murder. Not one, but two."
(R. Vol. VIII at 237-38.)
Here, the prosecutor was merely attacking the credibility of Broadnax's statement to law enforcement officers. These comments are within the scope of legitimate closing argument. Salter v. State, 578 So.2d 1092 (Ala.Cr.App.1990), cert. denied, 578 So.2d 1097 (Ala.1991). Indeed, the *186 prosecutor was arguing her interpretation of the evidence presented to refute Broadnax's statement; we find no plain error.
Regarding the prosecutor's comparison of his child to DeAngelo, we conclude the prosecutor was merely attempting to describe the young victim physically and mentally to the jury. The prosecutor stated:
"And then you have little DeAngelo. And they just don't get any more innocent that a little four-year-old boy, who hadn't even started prekindergarten yet.
"I don't know how many of you have children this age or remember when your kids were this age. I have got a little girl that's about three and a half now. And it is such a neat age, because they are just goingÔÇöthey have been an infant there they don't interact, and then they become kind of a toddler and they start to interact a little bit, and then they get to this age. And they are just starting to be a little person. They have got a personality. They ask a million questions. They are getting ready to start school. They are into everything. He took all of that away."
(R. Vol. VII at 166-67.)
The record reveals that the prosecutor, through the testimony of Stephanie Stamps, DeAngelo's mother, established, without objection, that DeAngelo had just began preschool and that he was four years and three months old at the time of his death. Thus, we conclude:
"[T]he prosecutor's comments about the victims were proper because they were based on evidence presented at trial. See Frazier v. State, 758 So.2d 577 (Ala. Cr.App.1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998); Smith v. State, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Whatever is in evidence at trial is considered subject to legitimate comment by counsel. Jenkins v. State, 627 So.2d 1034, 1050 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). The prosecutor's remarks about the victims were legitimate comments based on the evidence admitted at trial, or were reasonable inferences to be drawn from that evidence, and did not constitute improper victim-impact argument, as Freeman argues on appeal.
"Moreover, even if we were to assume that the prosecutor's comments were irrelevant and improper, we would find any resulting error harmless. In Smith v. State, opinion on return to remand, 756 So.2d at 904 (Ala.Cr.App.1998), we stated, relevant to such a claim:
"`"Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala. 1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of trial; we noted, however, that `a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' 663 So.2d at 1005."
"`Ex parte Land, 678 So.2d 224, 236 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).'"
Freeman v. State, 776 So.2d 160, 185 (Ala. Cr.App.1999).
Because the arguments advanced by the prosecutor were derived from the evidence *187 admitted at trial or a reasonable inference from the evidence, we conclude that no plain error occurred.
Broadnax further claims that the prosecutor improperly drew an analogy from a Clint Eastwood movie in his argument. During the guilt-phase closing argument, the prosecutor stated:
"There was a movie out a few years ago that Clint Eastwood made. It's called `Unforgiven.' There's a line in it that I'll never forget. There was this young hot-shot gunfighter talking to Clint Eastwood. The gunfighter said something about killing a man, killing a person, how good it was or something. I remember Clint Eastwood said: `Killing a man is a hell of a thing. You take away everything he's got and everything he's ever going to have.'
"And that's what he did to Jan. That's what he did with DeAngelo. He took away everything he was ever going to have.
"And we will never know what DeAngelo Stamps would have been, because to cover up his murder just because he was a witness, he beat his head in."
(R. Vol. VII at 167-68.)
In its analogy, the prosecution was arguing its theory that Broadnax's motive in intentionally killing DeAngelo was to cover up his murder of Jan.
"`The rule is that counsel are allowed considerable latitude in drawing their deductions from the evidence in argument to the jury.' Espey v. State, 270 Ala. 669, 674, 120 So.2d 904, 907 (1960)."
Woodall v. State, 730 So.2d 627, 650 (Ala. Cr.App.1997), aff'd in pertinent part, 730 So.2d 652 (Ala.1998).
Although Broadnax claims the above reference to Clint Eastwood was prejudicial, he fails to demonstrate how the comment was prejudicial or why such a comment would warrant reversal. We have read the prosecutor's comment in light of the entire closing argument and conclude that no plain error occurred.

G.
Broadnax claims that "[t]he prosecutor improperly argued victim impact evidence during the guilt phase of the trial." (Broadnax's brief to this Court at p. 70.) Specifically, Broadnax argues that the prosecutor's comments that the victims were not involved in any criminal activity, that they were involved with their church, and that Jan was trying to help him "militated for a capital conviction." (Broadnax's brief to this Court at p. 70.) Broadnax did not object to these comments at trial; therefore, our review is for plain error. Rule 45A, Ala.R.App.P.
As the state points out in its brief to this Court, testimony admitted during the trial indicated that Jan was scheduled to be at church the night of the murder, that Jan was attempting to help Broadnax obtain his parole, and that Broadnax may have blamed her for the denial of his parole. The prosecutor's comments were legitimate arguments from the evidence presented at trial. Freeman v. State, supra. Moreover, after reviewing the portion of the argument alleged to constitute error, we conclude that the statements made by the prosecutor were not of the character that would cause prejudice or violate the substantial rights of Broadnax. Ex parte Land, supra.

H.
Broadnax argues that, during the state's guilt-phase rebuttal argument, the prosecutor commented on his decision not to testify. Specifically, the prosecutor stated, "There was no testimony of him saying `I tried to call my brother.'" (R. Vol. VIII *188 at 246-47.) Our review is for plain error. Rule 45A, Ala.R.App.P.
"The prosecution has a right to comment on the failure of the defense to counter or explain the evidence." Coral v. State, 628 So.2d at 986, citing Ex parte Wilson, 571 So.2d 1251 (Ala.1990).
In Kuenzel v. State, supra, this Court stated:
"Although counsel has `no right to create evidence by his argument,' Davis v. State, 49 Ala.App. 587, 590, 274 So.2d 360, 363 (1972), cert. denied, 290 Ala. 364, 274 So.2d 363 (1973), `counsel may draw any inference which the facts tend to support.' Brothers v. State, 236 Ala. 448, 452, 183 So. 433, 436 (1938). `Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence.' Arant v. State, 232 Ala. 275, 279, 167 So. 540, 543 (1936). `Counsel has a right to argue any reasonable inference from the evidence or lack of evidence ... and to draw conclusions from the evidence based on their own reasoning.' Roberts v. State, 346 So.2d 473, 476 (Ala.Cr. App.), cert. denied, 346 So.2d 478 (Ala. 1977)."
577 So.2d at 493-94.
During closing argument, defense counsel presented an alibi defense, arguing that Broadnax telephoned his brother around 9:00 p.m. on April 25, 1996, from Alexander City. During closing argument, defense counsel stated:
"But Johnny Baker sat down, and y'all heard it on the tape. He told Vince Cunningham that `I saw Donald Broadnax in that break room on the telephone at 9:15.'
". . . .
"... You can believe what Dr. Brissie tells you. Johnny Baker, on the other handÔÇöand, again, you notice what witnesses do. Did you notice when I kind of got him about that, how he kind of twisted, `Oh, that's a good question.' I said, `Well, thank you.' He couldn't answer it straightforward.
"Let me tell you about that, ladies and gentlemen. He told Detective Cunningham when he talked to him that `I saw Donald Broadnax on that phone at 9:15.' And Vince Cunningham didn't have a reason to doubt him then, and he let him alone.
"He came over the very next dayÔÇö wellÔÇöhe talked to Donald on the 26th. The murder occurred on the 25th. Donald told him, `I was on the phone trying to make a call to my brother.' Vince asked him what time was that. He said, `About 9:15.'
"So they run out and get those phone records to show that he was lying about the 9:15, because if he wasn't, Johnny Baker told Vince Cunningham at a later date, `I saw him on the phone at 9:15,' you see. That coincides exactly with what Vince had got from Donald when he talked to him on the 26th. I was on the phone at 9:15 trying to call my brother.
"Mr. Cochran, being the good lawyer that he is, he stood and told you that the tape recording said, `I was talking to my brother.' That was not what Cunningham said, and that is not what the tape said. What it said was, `I was trying to call my brother.' So what they do is go out and get those phone records, bring that man in here this morning, `I am head of security. I take care of BellSouth's records.' And in the very end, he had to admit to you, `Well, I don't know what really happens. I just kind of secure them.' But he had to tell you this: That if you make a phone call and that phone is busy, you don't get a register. You don't get a printout. He *189 had to tell you that, because that is true. And thatÔÇöthat fit what Donald told Vince long before we knew any kind of phone records and that man was going to come in here, and that was, `I was trying to call my brother,' you see."
(R. Vol. VIII at 218-21.) (Emphasis added.)
During the state's rebuttal, the prosecutor stated:
"And I submit to you, Johnny Baker was in here telling the truth. Why else would he be doing it? He's been denied parole. It is obvious he's not getting rewarded for coming up with this. There's absolutely no tape of this defendant that's been played in here where he was saying, `I tried to call my brother.' Again, that came from Mr. Bender [defense counsel] who has not taken the oath. There was no testimony of his saying, `I tried to call my brother.' What did Detective Cunningham say? He said, `I called my brother,' and Detective Cunningham asked him for the number so he could check it out."
(R. Vol. VIII at 246-47.) (Emphasis added.)
When viewing the entire context of the prosecutor's closing argument, it is obvious that the prosecutor was not commenting on Broadnax's failure to testify. The state was merely commenting on whether Cunningham's testimony and a tape recording of a statement showed that Broadnax told the police that he had telephoned his brother from Alexander City, or that he had tried to telephone him. The prosecutor argued that the evidence demonstrated that Broadnax had told Cunningham that he had telephoned his brother at 9:15 p.m. Thus, the prosecutor's argument consisted of a proper argument on the evidence introduced at trial. Coral v. State, 628 So.2d at 985.
Given that the defense and the prosecution had conflicting interpretations of the statement made by Broadnax to Cunningham concerning a telephone call on the night of the offense, and that the telephone call was critical to Broadnax's alibi defense, the prosecutor's comment concerning the statement was not improper. Thus, the trial court did not commit plain error in permitting the prosecutor to comment on the statement Broadnax made to Cunningham.

I.
Broadnax argues that, during the state's closing argument, the prosecutor improperly commented on his choice not to testify. Specifically, he argues that the prosecutor's question, "Are they giving me another reasonable explanation for this?" was improper. (R. Vol. VII at 161.) Broadnax did not object to the prosecutor's question; therefore, we review for plain error. Rule 45A, Ala.R.App.P.
In Brooks v. State, 695 So.2d 176 (Ala. Cr.App.1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997), this Court stated:
"[A] prosecutor has the right to indicate to the jury those parts of the evidence or testimony presented by the State that the defense has failed to contradict; that process is not an infringement of the defendant's Fifth Amendment privilege against self-incrimination. Duncan v. Stynchcombe, 704 F.2d 1213, 1215-16 (11th Cir.1983); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993); Griffin v. State, 393 So.2d 523, 528 (Ala. Cr.App.1981)."
695 So.2d at 180 (holding that comment by prosecutor in closing argument that defense counsel did not produce evidence of the defendant's innocence was not a comment on the defendant's failure to testify).
*190 In Burton v. State, 651 So.2d 641 (Ala. Cr.App.1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), this Court stated:
"We must evaluate the comment in the context of the entire proceedings.
"`"Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), aff'd, 585 So.2d 112 (Ala.1991). See also Ward v. State, 440 So.2d 1227 (Ala.Cr.App. 1983). "The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." ... Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App.1986).'
"Williams, 601 So.2d at 1072-73. `"[C]ounsel in the trial of any lawsuit has the unbridled right (to be sure, duty) to argue the reasonable inferences from the evidence most favorable to his client."' Kuenzel, 577 So.2d at 492, quoting Ex parte Ainsworth, 501 So.2d 1269, 1270 (Ala.1986). (Footnote omitted.)"
651 So.2d at 651.
In this case, the defense argued that someone else committed the murder, and suggested that Broadnax's bloody clothes and boots were used by someone else during the incident in order to frame him for the murders.
During the state's closing argument, the prosecutor stated:
"The Judge is going to give you an instruction on circumstantial evidence. And I think it will be something like this: To convict on circumstantial evidence alone, there cannot be any other reasonable explanation for this set of circumstances. I [would] like to turn that around a little bit, because the flip side of that is true also. If you look at all the circumstances and you determine that there is no other reasonable explanation for all these things, then he's guilty, and you have to find him guilty if there's no other reasonable explanation.
"And he's got two fine attorneys. And what I want you to be thinking the whole time they're up here is: Are they giving me another reasonable explanation for all of this? Are they explaining this is a reasonable way? Does it make sense, or is it like that little boy with the cookie stains on his mouth saying that Martians beamed into the kitchen and took that bite out of the cookie? I mean, I don't know what their story is. Is it that this white guy that he supposedly sold these boots to a year before was picked up [as] a hitchhiker by Jan and killed her. And then, in the meantime, had broken into work release and stole some of his uniforms and then brought them back into work release, with his boots and uniforms and framed him? And if so, what is the person's motives? Look at whether they provide you with a reasonable explanation."
(R. Vol. VII at 160-62.) (Emphasis added.)
An evaluation of the comment in the context of the whole proceedings reveals that the prosecutor was merely stating that the circumstantial evidence indicated that Broadnax committed the murders. Because the comment was not an improper comment on Broadnax's choice not to testify, the trial court did not commit plain error. Rule 45A, Ala.R.App.P.

XVI.
Broadnax contends that there was insufficient evidence to support his capital murder convictions. (Issue *191 XXIV in Broadnax's brief to this Court.) Specifically, he argues that the state failed to present sufficient evidence to support each of his convictions, that the state failed to prove that venue was proper in Jefferson County, and the state's evidence was insufficient because it was entirely circumstantial.
"`In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact.' Maddox v. State, 620 So.2d 132, 133 (Ala.Cr.App.1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the state's evidence established a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). A trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App. 1983). Furthermore:
"`"`A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust.'"'
"McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App.1995), quoting Cox v. State, 500 So.2d 1296 (Ala.Cr.App.1986), quoting in turn other cases."
Presley v. State, 770 So.2d 104, 111 (Ala. Cr.App.1999).
With these principles in mind, we will address each of Broadnax's claims.

A. Broadnax's claim that the state failed to present sufficient evidence to support his convictions.
1. Broadnax's conviction for murder made capital because the murders of two or more people were committed pursuant to one scheme or course of conduct.
Viewing the evidence in a light most favorable to the state, we conclude that the state presented sufficient evidence to support Broadnax's conviction for this offense. The bodies of Jan and DeAngelo were found in the trunk of Jan's car. The evidence indicated that Jan and DeAngelo were each killed by blunt-force trauma within a three-hour period. Moreover, within that period, Broadnax was seen alone with a child and had told another inmate that Jan was in the hospital. Blood from Jan and DeAngelo was found on a uniform issued to Broadnax. The state presented sufficient evidence from which the jury could have found Broadnax guilty of murder made capital because the murders of Jan and DeAngelo were committed pursuant to one continuous course of conduct.
2. Broadnax's conviction for committing a murder within 20 years of his previous conviction for murder.
Viewing the evidence in a light most favorable to the state, we conclude that the state presented sufficient evidence to sustain Broadnax's conviction for this offense. The state admitted into evidence a certified copy of Broadnax's 1978 conviction for murder. The state also presented testimony that DeAngelo was killed in 1996. Thus, sufficient evidence was presented from which the jury could have found Broadnax guilty of this charge of capital murder.
*192 3. Broadnax's conviction for murder made capital because the murder was committed during a kidnapping.
Viewing the evidence in a light most favorable to the state, we conclude that the state presented sufficient evidence to sustain Broadnax's conviction for this offense. The testimony indicated that Broadnax was observed alone with a child in Alexander City. DeAngelo's body was found in the trunk of Jan's car in Birmingham later that evening. DeAngelo died from at least four blunt-force injuries. Clearly, the evidence was sufficient to suggest a finding that Broadnax committed murder during the course of a kidnapping.
4. Broadnax's conviction for murder made capital because the victim was less than 14 years old.
The state presented evidence that DeAngelo was four years old when he was killed. Viewing the evidence in a light most favorable to the state, we conclude that sufficient evidence was presented to sustain Broadnax's conviction for this offense.

B. Broadnax's claim that the state failed to prove that venue was proper in Jefferson County.
According to Broadnax, the state failed to prove that venue as to the murder/kidnapping of DeAngelo was proper in Jefferson County. Specifically, he argues that venue was proper only in the county where the kidnapping of DeAngelo took place, i.e., Tallapoosa County.
"`Proof of venue is necessary to sustain a conviction, and like any other fact in the case, when there is evidence in the case tending to prove that the offense was committed within the jurisdiction of the court, the question of venue becomes a fact for the jury to decide.' `In a criminal case, proof of venue is sufficient if it can be reasonably inferred from the facts and circumstances adduced.' Moreover, venue need not be established solely by direct evidence but rather, evidence from which it may be inferred is sufficient.
"The issue in the case at bar is whether the fact that a dead body found in Chilton County, Alabama, is sufficient evidence from which to infer venue in Chilton County. In Coleman[ v. State, 423 So.2d 276 (Ala.Cr.App.1982) ], a body was found on a mountain in Madison County, Alabama, very near the Tennessee State line. It was uncertain whether the murder occurred in Alabama or Tennessee. The court held that since it was conceivable that the murder could have occurred in either state, venue would be established in the state where the body was found. Id. Thus, in the case at bar, the State's evidence was sufficient to prove venue, and the Circuit Court for Chilton County had jurisdiction to hear the appellant's case."
Meyer v. State, 575 So.2d 1212, 1214 (Ala. Cr.App.1990) (citations omitted); see also Cox v. State, 660 So.2d 233, 235 (Ala.Cr. App.1994); Rothchild v. State, 558 So.2d 981, 985 (Ala.Cr.App.1989); Creech v. State, 508 So.2d 302, 303-04 (Ala.Cr.App. 1987)
The state's evidence indicated that DeAngelo was kidnapped in Tallapoosa County, but he was killed in Jefferson County. Dr. Brissie testified that his analysis of the direction of the blood spatters and the bloodstains indicated that DeAngelo was killed in Birmingham and was then placed in the trunk on top of Jan. Thus, the state presented evidence from which the trial court could determine venue *193 was proper in Jefferson County.[11]

C. Broadnax's claim that the evidence was insufficient because, he says, the state's case was entirely circumstantial.
"A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. Chafin v. State, 333 So.2d 599 (Ala.Cr.App.), cert. denied, 333 So.2d 609 (Ala.1976). As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. Agee v. State, 470 So.2d 1331 (Ala.Cr.App.1985)."
Smith v. State, 698 So.2d at 214. See Smith v. State, 745 So.2d 922 (Ala.Cr.App. 1999).
We have reviewed the entire record on appeal and we conclude that the circumstantial evidence presented at trial points to Broadnax's guilt. Even though much of the evidence linking Broadnax to the murders of Jan and DeAngelo was circumstantial, the evidence was sufficient to sustain Broadnax's convictions. See Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999).

XVII.
Broadnax claims the trial court erred reversibly when it failed to give his requested jury instructions. (Issue XIX in Broadnax's brief to this Court.) Specifically, Broadnax argues that the trial court inadequately instructed the jury concerning the state's burden of proving that the offenses occurred in the county where the case was tried.
"`A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonable ÔÇönot a strainedÔÇöconstruction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984).'
"Williams v. State, 710 So.2d 1276, 1305 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
"`"A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala. 1986)."
"`Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992).'
"Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Cr.App.1995)(emphasis omitted). See also Dill v. State, 600 So.2d 343, 353-54 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)."
Wilson v. State, 777 So.2d at 884.
Section 15-2-6, Ala.Code 1975, provides:
"When an offense is committed partly in one county and partly in another or the acts of effects thereof constituting or *194 requisite to the consummation of the offense occur in two or more counties, venue is in either county."
During its charge to the jury, the trial court stated the following:
"Now, ladies and gentlemen, under Title 15 of the code ... when an offense is committed partly in one county and partly in another, or the act or acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, venue is in either county.
"Now, venue really means location. Those cases that occur within the Birmingham Division of Jefferson CountyÔÇö and you'll remember when I organized the jury, I talked about the difference between the Birmingham Division of Jefferson County and the Bessemer Division. Within Jefferson County, if an offense occurs within the Birmingham Division, that is tried in the Birmingham Division. If it occurs in the Bessemer Cutoff, then it is tried in the Bessemer Cutoff Courthouse. And that is because that venue, what is the legal term, venue attaches as to whether theÔÇöwherever the offense occurred. But Title 15, Section 2-6 [provides], `An offense committed in more than one county: When an offense is committed partly in one county and partly in another or the act or effect thereof constituting or requisite to the summation of the offense occur in two or more counties, then venue is in either county'ÔÇöin other words, the case can be tried in either county.
"But in order for you to find that it can be tried in Jefferson County, since this was the death of two or more persons, and the State is alleging that Hector J. Stamps Broadnax was murdered inÔÇöI guess that's Coosa County, wherever Alexander City is, I think that's Coosa County[12]ÔÇöand that DeAngelo Stamps was murdered in the Birmingham Division of Jefferson County, in order for you to find that venue is attached, you must find that the murder of both these individuals were pursuant to one scheme or course of conduct.
"In order to find the defendant guilty if you have found all of the other elements present and have been proven beyond a reasonable doubt, you must further find that both deaths were caused during the course or pursuant to one scheme and/or either one scheme or course of conduct by the defendant.
"Now, if you find from the evidence that the State has proven beyond a reasonable doubt each of these elements of the offense of an intentional murder of two or more persons as charged, then you should find the defendant guilty of capital murder in this count of the indictment.
"If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of an intentional murder of two or more persons, then you cannot find the defendant guilty of capital murder in the count of the indictment."
(R. Vol. VIII at 270-73.)
Broadnax requested that the trial court instruct the jury as follows:
1. "I charge you, ladies and gentlemen, that unless the state has proven to each and everyone of you, beyond a reasonable doubt, that the offenses charged in the indictment returned in this case occurred in the Birmingham division of Jefferson County, you must find the defendant not guilty of the offenses charged, proof of venue being necessary to sustain a conviction.

*195 2. "I charge you, ladies and gentlemen, that if you find that the offenses charged in the indictment returned in this case occurred in two or more counties, you must find that the offense is divisible and each part is unlawful in and of it self, and committed at different times and places, or the offense must consist of more than one act, each of which acts or the effect of each act, must constitute an unlawful element of the offense, without the presence of which the offense could not be consummated. If you find otherwise, you must find the defendant to be not guilty, proof of venue being necessary to sustain a conviction.
3. "I charge you, ladies and gentlemen, that if you find beyond a reasonable doubt that the defendant committed the offense of causing the death of DeAngelo Stamps and Hector J. Stamps Broadnax by using blunt force trauma to the head, cause said death during Donald Broadnax's abduction of, or attempt to abduct DeAngelo Stamps with intent to inflict physical injury upon him, or to violate him sexually, in violation of  13A-5-40(a)(1) of the Alabama Criminal Code, against the peace and dignity of the state of Alabama, you must find that DeAngelo Stamps was taken or abducted, or that the attempt to abduct DeAngelo Stamps was committed in the Birmingham Division of Jefferson County, the proper venue for prosecution of this offense being the county from which the child was taken. If you find otherwise, you must find the defendant to be not guilty, proof of venue being necessary to sustain a conviction."
(C.R.33-35.)
Broadnax argues that his requested jury charge 1 provided an appropriate statement of the law when applied to the charge of murder wherein two or more persons were murdered by one act or pursuant to one scheme or course of conduct. This requested jury charge, however, is an inaccurate statement of the law in light of  15-2-6, Ala.Code 1975. The trial court, with regard to venue as to Count I, specifically instructed that the jury must determine that the murders of both individuals was pursuant to one scheme or course of conduct. It clearly indicated that if the jury did not find that the murders were committed pursuant to one scheme or course of conduct, then it could not find Broadnax guilty. Additionally, the trial court instructed that in order for the jury to reach its verdict that Broadnax was guilty as charged in Count I of the indictment, the jury must conclude that DeAngelo was killed in Jefferson County. Thus, the trial court adequately instructed the jury concerning venue in Jefferson County as applicable to Count I of the indictment.
While we acknowledge that the trial court did not instruct the jury with regard to venue as to the other counts charged in the indictment, we conclude after reviewing the trial court's instruction in its entirety that the jury was adequately instructed with regard to venue.[13] By the jury's finding Broadnax guilty as to Count *196 I, the jury determined that DeAngelo was killed in Jefferson County. Indeed, the jury implicitly determined that venue was proper in Jefferson County as to the rest of the counts in the indictment. Therefore, we conclude that error, if any, in the trial court's refusal of Broadnax's requested jury charge 1 was harmless.
Broadnax's requested jury charge 2 applied only to Count I in the indictment. As previously stated, the trial court adequately instructed the jury on the applicable law concerning venue where the alleged offense occurred in two counties. See  15-2-6, Ala.Code 1975. The trial court did not abuse its discretion in denying Broadnax's request with regard to requested charge 2.
Broadnax's requested jury charge 3 is an inaccurate statement of the law. Broadnax relies on Boyd v. State, 542 So.2d 1247 (Ala.Cr.App.1988), wherein we stated that venue in a murder/kidnapping case was proper in the county in which the abduction occurred. Broadnax urges us to interpret Boyd as meaning that venue in a murder/kidnapping case is proper only in the county wherein the victim was abducted. We refuse to so interpret Boyd. We interpret  15-2-6, Ala.Code 1975, to permit venue in either the county of the abduction or the county of the murder. To conclude otherwise would negate the purpose of the statute and, as the trial court stated, "could completely affront the capital punishment statute." (R. 137.) Therefore, we conclude that the trial court did not err in refusing Broadnax's requested charge 3.
We conclude that the trial court did not err reversibly in denying Broadnax's requested jury charges.

XVIII.
Broadnax claims that instructional errors made by the trial court during the guilt phase of his trial denied him of a fair trial and a reliable verdict. (Issue VI in Broadnax's brief to this Court.) Broadnax made no objection to the trial court's jury instructions; therefore, our review is limited to one for plain error. Rule 45A, Ala. R.App.P.
"In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that `an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.' Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998)."
Pilley v. State, 789 So.2d at 882-83.
Moreover,
"[w]hen reviewing a trial court's instructions, `"the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together."' Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992)(quoting Porter v. State, 520 So.2d 235 (Ala.Cr. App.1987); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992))."
Maples v. State, 758 So.2d at 65.

A.
Broadnax claims that the trial court improperly instructed the jury regarding perjured testimony. Specifically, Broadnax argues that the "trial court improperly instructed the jury that [it] could disregard [a witness's] testimony only if [it] found that the witness deliberately lied *197 about a material fact." (Broadnax's brief to this Court at p. 39.) Broadnax further claims that the trial court erred because, he says, the term "material fact" was not adequately defined for the jury. During its guilt-phase instructions to the jury, the trial court stated:
"Now, if you find that you cannot reasonably reconcile the testimony of the witnesses so as to make all of them speak the truth, then you should determine what testimony you find to be true and what testimony you find to be untrue, disregard that which you find to be untrue and consider that which you find to be true.
"Now, if you should determine that any witness has willfully testified falsely as to any matter materially affecting the issues involved in the trial of this case, then you may refuse to believe all or any parts of that witness's testimony.
"But in order for you to justify disregarding the testimony of the witness, you must find that that witness has willfully testified falsely to a material matter in the case.
"Now, to willfully testify falsely, the law does not mean a situation where you might find that a witness has, in trying to tell the truth, made a mistake [of] fact. By willfully testifying falsely, the law means a situation where you might find that a witness has testified to something that that witness knows to be untrue in an attempt to mislead the jury."
(R. Vol. VIII at 261-62.)(Emphasis added.)
We conclude that the trial court's charge to the jury, taken as a whole, adequately apprised the jury as to how it was to gauge the credibility of the witnesses.
"`To justify the jury in entirely disregarding the testimony of the witness, they must have found that the material portions of said declaration were willfully false. Such is the holding of our authorities.' Booth v. State, 247 Ala. 600, 604, 25 So.2d 427, 430 (1946), and cases cited therein. `It is not sufficient that a witness testify falsely that his evidence may be disregarded, but the testimony must be willfully or corruptly false. The witness might testify falsely through mistake, and at the same time be entitled to credence.' Reeder v. State, 210 Ala. 114, 119, 97 So. 73, 77 (1923)."
Connolly v. State, 602 So.2d 443, 451 (Ala. Cr.App.1990), rev'd on other grounds, 602 So.2d 452 (Ala.1992). See also Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).
Additionally, although the trial court did not expressly define the term "material fact," the trial court did instruct the jury that the false testimony must affect the issues involved in the trial of this case. Thus, the trial court implicitly defined "material fact." No plain error occurred with regard to this instruction.

B.
Broadnax claims that the trial court improperly instructed the jury regarding "reasonable doubt." Specifically, he argues that the trial court's instruction to the jury that "a reasonable doubt is a doubt [that] must be `sound' and `sensible,' and that it must be a doubt more concrete than `speculative' or `fanciful'" unconstitutionally lowered the state's burden of proof. (Broadnax's brief to this Court at p. 40.)
In support of his argument, Broadnax cited Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In Cage, the United States Supreme Court stated that it was reversible error for the trial court to define reasonable doubt so as to lower the state's degree of proof below that required by the Due Process Clause.

*198 "In Knotts v. State, 686 So.2d 431 (Ala. Cr.App.), opinion after remand, 686 So.2d 484 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), we stated, relevant to this claim:
"`The Due process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) ] the United States Supreme Court found that a jury charge that defined "reasonable doubt" by using the phrases "grave uncertainty," "actual substantial doubt," and "moral certainty" could have led a reasonable juror to interpret the instructions to allow a finding of guilty based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994)(quoting Estelle v. McGuire, 502 U.S. 62, 72-73, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, 513 U.S. 1023, 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr. App.1994).'"
Whitehead v. State, 777 So.2d at 834.
Additionally,
"`the Court in Victor [v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) ] also stated, "The Constitution does not dictate that any particular form of words be used in advising the jury of the government's burden of proof, so long as `taken as a whole, the instructions correctly conveyed the concept of reasonable doubt.' Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150." 511 U.S. at 22, 114 S.Ct. at 1251.'"
Price v. State, 725 So.2d at 1022.
During its guilt-phase charge to the jury, the trial court stated the following:
"A reasonable doubt, ladies and gentlemen, may grow out of all of the evidence, it may grow out of a part of the evidence, or it may grow out of a lack of the evidence. The terms `reasonable doubt' and `moral certainty' are equivalents of each other. And this means that if you are convinced from the evidence of the defendant's guilty beyond a reasonable doubt, then you would be convinced to a moral certainty. And, of course, the reverse of this is true.
"The term `reasonable doubt' is self-defining. It means a doubt that is reasonable, a doubt for which a reason can be given. And by reason, the law means a sound sensible reason. And since this is true, a reasonable doubt does not mean an imaginary doubt, a speculative doubt, or a fanciful doubt. It means just as it says, a reasonable doubt.
"Moral certainty does not mean to a mathematical certainty, because in all likelihood, as long as you depend on the testimony of human beings, you would never be able to be convinced to a mathematical *199 certainty. The best way I know of putting this, ladies and gentlemen: If after a full and fair consideration of all of the evidence in this case, there remains in your minds an abiding conviction that the defendant is guilty as charged, then you would be so convinced beyond a reasonable doubt. And in that event, the defendant should be convicted. On the other hand, if after that same full and fair consideration of all of the evidence in this case, there does not remain in your minds an abiding conviction that the defendant is guilty as charged, then you would not be so convinced beyond a reasonable doubt. And in that event, the defendant should be acquitted."
(R. Vol. VIII at 254-56.)
We conclude the trial court's instruction could not be reasonably interpreted to lower the state's burden of proof. Taylor v. State, 808 So.2d 1148 (Ala.Cr.App.2000); Woods v. State, 789 So.2d 896 (Ala.Cr.App. 1999); and Minor v. State, supra. Furthermore, the trial court's definition of reasonable doubt substantially tracks the instruction in the Alabama Pattern Jury Instructions: Criminal (3d ed.1994). After reviewing the trial court's instruction to the jury on reasonable doubt, we conclude that, taken as a whole, the instruction adequately defined reasonable doubt so that there is no reasonable likelihood that the jury would have applied it in an unconstitutional manner.

C.
Broadnax claims that the trial court improperly asked for exceptions to its jury instructions within the hearing of the jury. After the trial court completed its guilt-phase charge to the jury, the following occurred:
"THE COURT: What says the State to the Court's charge to the jury?
"[Prosecutor]: The State is satisfied.
"THE COURT: What says the defense to the Court's charge to the jury?
"[Defense counsel]: With the exceptions previously suggested, we're satisfied."
(R. Vol. VIII at 292.)
We recently addressed this identical issue in Griffin v. State, 790 So.2d 267 (Ala. Cr.App.1999), wherein we stated:
"According to Griffin, Rule 21.2 (currently Rule 21.3), Ala.R.Crim.P., requires the trial court to `inquire whether there are any exceptions [to the jury charge] out of the hearing of the jury.'... Rule 21.3, Ala.R.Crim.P., states in pertinent part:
"`Opportunity shall be given to make the objection [to the jury charge] out of the hearing of the jury.'
"(Emphasis added.) While Rule 21.3, Ala.R.Crim.P., does state that the trial court should provide the parties with an opportunity to object outside the jury and while we believe that to be the better practice, we conclude that Griffin's rights have not been adversely affected. The court's merely asking if there were any exceptions to the jury instructions and the indication by both parties that they were satisfied with the instructions did not prejudice Griffin.
"We reject Griffin's argument that because his counsel was forced to answer the question whether he was satisfied with the charge in the presence of the jury, the answer was unreliable. Such a claim is bare speculation. Our review of the record indicates that trial counsel actively advocated and advanced Griffin's right to a fair trial. We find no plain error in the procedure used by the trial court."
790 So.2d at 335-36.
Likewise, we conclude no plain error occurred here. The record indicates that *200 Broadnax did not request an opportunity to make any objections outside the jury's presence. In addition, Broadnax has failed to present on appeal what particular objections, if any, he was not allowed to present to the trial court outside the presence of the jury or how he was prejudiced by the trial court's procedure. There is no plain error.

XIX.
Broadnax claims that the trial court reversibly erred by not charging the jury on lesser-included offenses. (Issue V in Broadnax's brief to this Court.) Broadnax argues that because the trial court did not instruct the jury on any lesser-included offenses the trial court "directed the jury's verdict." (Broadnax's brief to this Court at p. 24.) The record indicates that Broadnax requested only three charges to the jury. These requested charges addressed the state's proof of venue. Because Broadnax did not request the trial court to instruct on lesser-included offenses or object after the trial court completed its instruction to the jury to the lack of instructions on lesser-included offenses, our review is for plain error. See Rule 45A, Ala.R.App.P.
Section 13A-5-41, Ala.Code 1975, states:
"Subject to the provisions of  13A-1-9(b), the jury may find a defendant indicted for a crime defined in  13A-5-40(a), not guilty of the capital offense but guilty of a lesser included offense or offenses. Lesser included offenses shall be defined as provided in  13A-1-9(a), and when there is a rational basis for such a verdict, include but are not limited to, murder as defined in  13A-6-2(a), and the accompanying other felony, if any, in the provision of  13A-5-40(a) upon which the indictment is based."
The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture. Boyd v. State, 699 So.2d 967 (Ala. Cr.App.1997). Moreover, "`[a] charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge. Beck v. State, 396 So.2d 645 (Ala.1980).'" Ex parte Myers, 699 So.2d 1285, 1291 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998), quoting Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App. 1982). A defendant may be entitled to a lesser included charge "even if the evidence supporting the charge is offered by the State." 699 So.2d at 1290-91.
Section 13A-1-9(a) and (b), Ala.Code 1975, states:
"(a) A defendant may be convicted of an offense included in an offense charged. An offense is an included one if:
"(1) It is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged; or
"(2) It consists of an attempt or solicitation to commit the offense charged or to commit a lesser included offense; or
"(3) It is specifically designated by statute as a lesser degree of the offense charged; or
"(4) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interests, or a lesser kind of culpability suffices to establish its commission.
"(b) The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."
*201 A defendant is entitled to a jury charge only on an applicable lesser-included offense to the offense charged in the indictment. Holladay v. State, 549 So.2d 122, 129 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989)(emphasis added).
Initially, we note that a request for instructions on lesser-included offenses was inconsistent with Broadnax's trial defense. The evidence unequivocally indicated that Jan and DeAngelo were killed on April 25, 1995, within a three-hour period, by blunt-force trauma. Testimony indicated that Jan and DeAngelo went to Welborn to deliver Broadnax's dinner. A short time later, Broadnax was observed at Welborn in Jan's car with DeAngelo in the backseat. Jan's car was found a few hours later in Birmingham, parked behind an abandoned house. The bodies of Jan and DeAngelo were found in the trunk. Broadnax's counsel, through cross-examination of the state's witnesses and in argument, presented the defense that, according to the state's time-line and the evidence presented, it was physically impossible for Broadnax to have committed the murders. Broadnax's counsel in closing argument stated, "[Broadnax] has said to me from the very beginning that he did not do it." (R. Vol. VIII at 191.) It is abundantly clear from the record that Broadnax's defense strategy did not support a request for instructions on lesser-included offenses. Thus, based on the evidence, Broadnax was either guilty of capital murder because he murdered Jan and DeAngelo pursuant to one scheme or course of conduct, because he committed murder within the 20 years of his previous conviction of murder, because he committed murder during a kidnapping, and because he murdered DeAngelo, who was less than 14 years oldÔÇöor he was not guilty. "When the evidence clearly shows the appellant either was guilty of the offense charged or is innocent, the charge on a lesser included offense is not necessary or proper. Perry v. State, 455 So.2d 999 (Ala.Cr.App.1984)." Breckenridge v. State, 628 So.2d 1012, 1017 (Ala.Cr.App.1993). Thus, Broadnax's argument on appeal that the trial court should have instructed on lesser-included offenses is inconsistent with Broadnax's strategy at trial.
However, in an abundance of caution, we will address the merits of Broadnax's argument. Because Broadnax was convicted of four separate counts of capital murder, we will discuss the arguments regarding each count separately.

A. Count I: Murder of two or more persons pursuant to one scheme or course of conduct.
Broadnax claims that the trial court erred in not charging the jury on the lesser-included offense of intentional murder with regard to this count. According to Broadnax, because the state's position was that Jan and DeAngelo "were killed nearly one hundred miles apart" and that "their deaths were separated by over an hour," the jury could have concluded that Jan and DeAngelo were not killed pursuant to the same course of conduct or scheme. (Broadnax's brief to this Court at p. 25.)
In Holladay v. State, 549 So.2d at 130, this Court stated:
"The crime of intentional murder is automatically elevated to capital murder when two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct."
See Fisher v. State, 587 So.2d 1027, 1033 (Ala.Cr.App.1991), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).
*202 We refuse to conclude, as Broadnax urges us to do, that the evidence indicating that Jan was killed in Alexander City while DeAngelo was killed in Birmingham and that the fact that "their deaths were separated by over an hour" establish a reasonable theory to justify two convictions for intentional murder. The element of one scheme or course of conduct is not limited by location or time and there is no indication from the evidence presented that the murders were not pursuant to one scheme or course of conduct. To conclude otherwise would offend the Legislature's intent in elevating such murders to capital. Thus, a charge on intentional murder was not proper based on the offense charged in the indictment.
We conclude that no reasonable theory exists under the evidence presented by the state and the argument of counsel to support an instruction on intentional murder. No plain error occurred.

B. Count II: Murder by a defendant who has been convicted of another murder in the 20 years preceding the current crime.
Broadnax alleges that the trial court erred in failing to give instructions of the lesser-included offenses of intentional murder and manslaughter with regard to this count.
According to Broadnax, an instruction on intentional murder was appropriate because, he says, the state never proved that his prior conviction for murder occurred within 20 years of the current offense. He argues that,
"the jury was compelled to find under count two of the indictment that [he] committed the capital offense of intentional murder within 20 years of another homicide, or simply not guilty of the offense at all."
(Broadnax's brief to this Court at p. 25.)
Section 13A-5-40(a)(13), Ala.Code 1975, elevates an intentional murder to a capital offense if the "[m]urder [is committed] by a defendant who has been convicted of any other murder in the 20 years preceding the crime." (Emphasis added.) At trial, the state, without objection from Broadnax, introduced a certified copy of his previous murder conviction. (R. Vol. VII at 140.) The certified copy of the conviction indicates that Broadnax was convicted of second-degree murder on April 13, 1978. The evidence in this trial established that the Jan and DeAngelo were murdered on April 25, 1996. Thus, the murders of Jan and DeAngelo occurred within the 20 years of Broadnax's previous conviction for murder. Because the murders of Jan and DeAngelo, occurred within 20 years of his previous conviction for murder, an instruction on intentional murder was not appropriate.
We reject Broadnax's argument that because he was 16 when he was convicted of the first murder, "the jury could have harbored doubts as to whether the 1977 homicide sufficed under this capital charge." The certified copy of Broadnax's conviction indicated that Broadnax was tried as an adult, that he was convicted of the offense of murder in the second degree, and that he was sentenced to 99 years' imprisonment. The jury had to conclude based on Broadnax's 1978 conviction, that he had committed the 1977 murder. There was no opportunity, as Broadnax's counsel argues, for "harbored doubts"; Broadnax's previous conviction was a fact. Thus, Broadnax's argument presents only bare allegation and speculation; we cannot find plain error based on such a minimal showing. No plain error occurredÔÇöthe jury was not instructed on intentional murder as a lesser-included offense of capital murder as charged in Count II.
Broadnax also argues that the trial court erred in not instructing the jury *203 on manslaughter as a lesser-included offense as to this count. A person commits the offense of manslaughter if he causes the death of another person recklessly or as a result of a sudden heat of passion resulting from legal provocation. See  13A-6-3, Ala.Code 1975. Broadnax does not allege, and we cannot comprehend, any reasonable theory based on the evidence presented at trial by the state or by Broadnax's alibi defense to support such a charge. Jan was struck with a blunt object 14 times; DeAngelo was struck at least 4 times. Based on the evidence presented in this case, there is absolutely no evidence to support an instruction for manslaughter.

C. Count III: Murder during kidnapping in the first degree.
Broadnax claims that the trial court erred in not charging the jury on the lesser-included offenses of intentional murder, felony murder, and manslaughter.

1. Trial court's failure to charge on intentional murder.
Broadnax argues that because "the state's evidence of a kidnapping was weak, at best," the trial court erred in not instructing the jury on intentional murder. (Broadnax's brief to this Court at p. 26.).
This Court has previously held:
"Intentional murder, as defined in  13A-6-2(a)(1), Ala.Code 1975, is an element of the capital offense of murder committed during a kidnapping, as defined in  13A-5-40(a)(1), Ala.Code 1975, and this element must be proven to support a conviction of the capital offense."
Loggins v. State, 771 So.2d 1070, 1092 (Ala.Cr.App.1999). Likewise, in order to support a capital conviction under  13A-5-40(a)(1), Ala.Code 1975, the state must prove that an intentional murder occurred during a kidnapping, as defined in  13A-6-43(a), Ala.Code 1975.[14]
In order to prove kidnapping in the first degree, we have held as follows:
"[T]he State must prove two intents: The first deriving from the abduction element and the second from the statutory subdivisions of  13A-6-43(a)(1)(6). The abduction element of kidnapping in the first degree is defined at  13A-6-40(2), [Ala.Code 1975], as follows:
"(2) Abduct. To restrain a person with intent to prevent his liberation by either:
"(a) Secreting or holding him in a place where he is not likely to by found, or
"(b) Using or threatening to use deadly physical force.
". . . .
"Proof of intent, necessary to convict under  13A-6-43, `must be found by the jury and may be inferred from the facts and circumstances attending the whole transaction.' Doss v. State, 23 Ala.App. 168, 180, 123 So. 237, 248 (1929). In the case at bar, the State's evidence was predominantly circumstantial in nature. `A conviction may be had on evidence which is entirely circumstantial, so long as that evidence is so strong and cogent as to show defendant's guilt to a moral certainty.' Tanner v. State, 291 Ala. 70, 71, 277 So.2d 885, 886 (1973). `The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of *204 guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.' Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). In reviewing the sufficiency of the State's evidence of kidnapping in the first degree, we must view the evidence in the light most favorable to the State. Id."
Owens v. State, 531 So.2d 2, 13-14 (Ala.Cr. App.1986).
In this case, the evidence clearly indicated that DeAngelo was murdered during the course of a kidnapping; thus, an instruction on intentional murder was not supported by the evidence. On the evening of the murders, Jan and DeAngelo went to Welborn to deliver Broadnax's dinner. Baker, an inmate and co-worker of Broadnax, testified that on the night of the murders he saw Broadnax in a vehicle and Broadnax had a small child with him. According to Baker, Broadnax appeared to be shaking, nervous, and sweating. Baker testified that Broadnax told him that Jan was in a local hospital. Jan and DeAngelo's bodies were found later that evening at an abandoned house in Birmingham in the trunk of the vehicle Baker had seen Broadnax in. Additionally, Dr. Brissie, testified that DeAngelo died as a result of extensive blunt-force trauma to the head, which caused major brain damage. Dr. Brissie indicated that DeAngelo received at least four or five blows to the head. Dr. Brissie opined that because of the amount of blood found at the Birmingham crime scene and the condition of DeAngelo's body, DeAngelo was killed in Birmingham. Thus, based on where DeAngelo's body was found and the severe trauma inflicted on him, we conclude that there was no evidence from which the jury could have reasonably concluded that he was not intentionally murdered during a kidnapping. The evidence clearly indicated that DeAngelo was alive and alone with Broadnax at Welborn, that DeAngelo was still alive during the drive from Alexander City to Birmingham, and that he was killed in Birmingham. DeAngelo was kidnapped and during that kidnapping he was murdered. No evidence was presented by the defense or the state from which the jury could have reasonably concluded that DeAngelo was killed first, then driven to Birmingham.
We reject Broadnax's argument that the evidence did not support a conviction of kidnapping/murder because according to Baker's testimony, "DeAngelo Stamps was not in distress, was not crying, and was apparently sitting quietly in the car when Mr. Broadnax and Baker spoke." (Broadnax's brief to this Court at p. 26.) The intent and abduction elements of kidnapping were established when DeAngelo was taken from Alexander City to Birmingham and left at an abandoned house. It is immaterial whether DeAngelo was in distress, crying, or upset.
Moreover, the intent element of the intentional murder was established when Dr. Brissie testified that DeAngelo's death was caused by extensive blunt-force trauma to the head. Particularized intent to kill was clearly established by the testimony indicating that DeAngelo received at least four or five blows to the head. Thus, based on the fact that DeAngelo's body was found in Birmingham and the severe trauma inflicted on him, we conclude that there was no evidence from which the jury could have reasonably concluded that he was not intentionally murdered during a kidnapping. We, therefore, conclude that the trial court did not err in not charging the jury on intentional murder.

2. Trial court's failure to charge on felony murder.
Broadnax claims that the trial court erred in not instructing the jury *205 on felony murder because, he says, "the jury could have found that [he] did not have the required specific intent to kill [DeAngelo]." (Broadnax's brief to this Court at p. 26.) As we stated in Hall v. State, 820 So.2d 113, 139 (Ala.Cr.App. 1999):
"`Lesser included offense instructions should be given when there is a "reasonable theory from the evidence" supporting such an instruction. Jenkins [v. State, 627 So.2d 1034 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993) ]. Here, there was no reasonable theory to support a charge on felony-murder. "`The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.'" White v. State, 587 So.2d 1218, 1231 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).'"
(Emphasis added.) Broadnax denied participating in DeAngelo's murder. There was no evidence presented that DeAngelo's death was unintentional; therefore, a charge on felony murder was not supported by the record. See Boyd v. State, supra. See also Coral v. State, supra (the trial court properly refused to give lesser included offense charges concerning felony murder in a capital-murder case in which the defendant had raised an alibi defense during the guilt phase).

3. Trial court's failure to instruct on manslaughter.
As we concluded in Part XIX.B. of this opinion, no evidence was presented from which the jury could have reasonably concluded that DeAngelo's death was caused either recklessly or as a result of a sudden heat of passion. DeAngelo was last seen alive and alone with Broadnax in Alexander City. The evidence indicated that DeAngelo, who was struck at least four times, was killed in Birmingham. There is absolutely no evidence to support an instruction for manslaughter.

D. Count IV: Murder when the victim is less than 14 years of age.
According to Broadnax, the trial court should have charged the jury on manslaughter under Count IV of the indictment. Specifically, Broadnax claims that, based on the state's theory that he killed Jan because she interfered with the possibility of his parole, "[t]he jury could have easily doubted that [he] ever intended to kill DeAngelo Stamps." (Broadnax's brief to this Court at p. 27.) No reasonable theory was presented from the evidence or was argued by Broadnax on appeal to support a charge on manslaughter.
We conclude that the trial court did not err by not instructing the jury on any of the lesser-included offenses Broadnax argues on appeal would have been appropriate. The defense presented by Broadnax was inconsistent with and did not provide a reasonable theory to support any of the instructions Broadnax argues on appeal should have been given. We find no plain error here.

XX.
Broadnax contends that the Alabama statute limiting court-appointed attorney fees to $1,000 compensation for out-of-court work in each phase of a capital case violates the Alabama Constitution and the federal constitution. (Issue XXII in Broadnax's brief to this Court.) Specifically, he argues that the limitation on attorney compensation constitutes a taking without just compensation and violates the separation-of-powers doctrine and the Equal Protection Clause in contradiction of the protections afforded by the Fifth, Sixth, Eighth, and Fourteenth Amendments *206 of the United States Constitution, and by the Alabama Constitution and Alabama law.
Upon considering the constitutionality of the Alabama statute in question here, we reiterate our holding in Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), where Boyd raised an identical issue:
"This court has previously rejected similar claims and adheres to its prior decisions on this matter. Smith v. State, 581 So.2d 497, 526-29 (Ala.Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); May v. State, 672 So.2d 1310, 1311 (Ala.1995)."
715 So.2d at 850. See also Burgess v. State, 723 So.2d 742, 756 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993). Therefore, in accordance with our previous decisions, we find Broadnax's contention to be without merit.
"It should be noted that the Alabama Legislature recently passed the `Investment in Justice Act of 1999,' and, in pertinent part, that Act amended  15-12-21[, Ala.Code 1975]. Under the new Act, the rate of compensation for attorneys representing indigent criminal defendants is increased to $50 per hour for in-court time and $30 per hour for out-of-court time, with no limit on compensation for an attorney in a case involving a capital offense. Moreover, effective October 1, 2000, the hourly rate increases to $40 per hour for out-of-court time and $60 per hour for in-court time."
McWhorter v. State, 781 So.2d at 306.
As concerns Broadnax's specific claims that the statutory limitation on attorney fees constitutes a taking without just compensation and violates the separation of powers, these issues have been previously addressed and rejected by this Court and by the Alabama Supreme Court. See, e.g., Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Hyde v. State, supra; Barbour v. State, 673 So.2d 461 (Ala.Cr. App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); May v. State, 672 So.2d 1307 (Ala.Cr.App.1993), writ quashed, 672 So.2d 1310 (Ala.1995); Johnson v. State, 620 So.2d 679 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); and Smith v. State, 581 So.2d 497 (Ala.Cr.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991), aff'd on return to remand, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Thus, we reject Broadnax's contention that the limit on fees for court-appointed attorney's violates constitutional protections.

Penalty-phase Issues

XXI.
Broadnax claims that "repeated prosecutorial misconduct denied [him] a fair trial and an accurate penalty determination." (Issue X in Broadnax's brief to this Court at p. 60.)
Broadnax did not object to these alleged instances of prosecutorial misconduct; therefore, our review is limited to plain error. Rule 45A, Ala.R.App.P.
When reviewing a prosecutor's comments made in argument during the penalty phase of a capital case, "we must determine whether the comment `so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Darden v. Wainwright, 477 U.S. [168], 181, 106 S.Ct. [2464], 2471, 91 L.Ed.2d 144, 157 [(1986)]." Dobyne v. *207 State, 672 So.2d 1319, 1348 (Ala.Cr.App.), aff'd on remand, 672 So.2d 1353 (Ala.Cr. App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).

A.
Broadnax contends that the following comments by the prosecutor during his first closing argument in the penalty phase were "highly improper":[15]
"First of all, I want you to remember how much mercy he showed Jan and DeAngelo.
"And secondly, I want you to ask yourself, what would Jan and DeAngelo have given to have fine attorneys like that, to beg for their life, beg for mercy for them? Don't you know they would have given anything?
"We have got very formal proceedings under the law for which when we impose death as a punishment. We sat here on Monday, and askedÔÇöthere was a whole courtroom full of folks. And we asked them if they can impose death as a punishment. But there was one person in this courtroom that we didn't have to ask that question here, and he's sitting right there, because we know he believes in the death penalty (indicating). He believes in it not one time, not two times, but three times. Three times he personally has imposed the death penalty.
"We have given him due process. He's got a jury. He's got an incredibly attentive bunch of folks sitting here listening to all this evidence. He's got the presumptions of innocence. He's got a judge who rules on evidence. He's got all this due process and everything we have given him before we make a decision whether to take his life.
"Well, before you make a decision to recommend to Judge Garrett, this was a due process he gave Jan and DeAngelo (indicating). He was the judge; he was the jury; and he was the executioner."
(Vol.VIII, R. 327-28.)
In McNair v. State, 653 So.2d 320 (Ala. Cr.App.1992), aff'd, Ex parte McNair, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), we addressed the impropriety of the prosecutor's comments about victim's rights. In McNair, the prosecutor argued not only that McNair had a right to have his Constitutional rights protected, but also that the victim deserved to have her rights protected. We determined that the prosecutor's references to the victim's rights and the implication that her rights were to be balanced against McNair's rights was improper, but that the prosecutor's statements were uttered in the "heat of debate," were not determinative factors in the jury's formation of the verdict, and did not constitute reversible error.
We have reviewed the state's penalty-phase argument in its entirety. We conclude that the comments did not have so strong an impact on the jury as to change the outcome of the penalty phase and did not so infect the jury with unfairness that a reversal is warranted. See Dobyne v. State, 672 So.2d at 1340; Henderson v. State, 584 So.2d at 857 (stating "the prosecutor's comment that the appellant apparently believed in capital punishment, because he served as judge, jury, and executioner for the victim, was not error. The prosecutor has the right to argue his opinion from the record.").

B.
Broadnax contends that the "prosecutor urged the jury to sentence *208 [him] to death for a homicide that was twenty years old." (Issue X.D. in Broadnax's brief to this Court at p. 67). Broadnax cites the following argument as being improper:
"[W]e know he believes in the death penalty (indicating). He believes in it not one time, not two times, but three times. Three times he personally has imposed the death penalty."
(Vol.VIII, R. 328.)
The prosecutor's comment referencing Broadnax's 1978 conviction for murder was a legitimate inference from the evidence presented and was not reversible error.
"A prosecutor may argue in closing any evidence that was presented at trial. He may also `"present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way."` Williams v. State, 601 So.2d 1062, 1073 (Ala.Cr.App. 1991), aff'd without opinion, 662 So.2d 929 (Ala.1992), quoting Donahoo v. State, 505 So.2d 1067, 1073."
Williams v. State, 627 So.2d 994 (Ala.Cr. App.), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). See also Dobyne v. State, 672 So.2d at 1340; Henderson v. State, supra.

XXII.
Broadnax contends that he was subjected to double jeopardy when the same evidence used to elevate the offense from an intentional murder to capital murder was also used as aggravating circumstances during the penalty phase of his trial. (Issue XV in Broadnax's brief to this Court.)
During its penalty-phase charge to the jury, the trial court instructed the jury it could consider as aggravating circumstances the fact that the defendant had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person (see  13A-5-49(2), Ala.Code 1975) and that the capital offense was committed while the defendant was engaged in the commission of a kidnapping (see  13A-5-49(4), Ala.Code 1975). According to Broadnax, the trial court's instructions amounted to double counting and "subjected [him] to two punishments for the same act" and "undermined the guiding function that aggravating circumstances are supposed to play, resulting in an arbitrary imposition of the death penalty." (Broadnax's brief to this Court at pp. 83-84.) Broadnax, however, concedes that the Alabama Supreme Court has held that "double counting does not, generally, offend the State Constitution." (Broadnax's brief to this Court at p. 82.)
This Court recently addressed this issue stating:
"  13A-5-50, Ala.Code 1975, provides, in pertinent part:
"`The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'
"Thus, under  13A-5-50, Ala.Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is specified as an aggravating circumstance in  13A-5-49, Ala.Code 1975. Also, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. See Burton v. State, 651 So.2d 641 (Ala.Cr.App. *209 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995)."
Wilson v. State, 777 So.2d at 921.
Applying the foregoing law to the facts of this case, we reject Broadnax's double-jeopardy claim.

XXIII.
Broadnax contends that instructional errors by the trial court during the penalty phase of trial denied him a fair trial and a reliable verdict. (Issue VI in Broadnax's brief to this Court.) Broadnax made no objection to the trial court's jury instructions; therefore, our review is limited to one for plain error. Rule 45A, Ala. R.App.P. Applying the law concerning review of a trial court's jury instructions set forth in Part XVIII of this opinion, we address Broadnax's claims.

A.
Broadnax contends that the trial court incorrectly instructed the jury on the aggravating circumstance that the offenses were especially heinous, atrocious, or cruel compared to other capital offenses. (Issue VI.A.i. in Broadnax's brief to this Court.) Specifically, he argues that "[a]fter defining the terms heinous, atrocious, and cruel, the trial court instructed the jury that the offense had to be `especially' so." According to Broadnax, the trial court's instruction "resulted in an overbroad and arbitrary application of this aggravating circumstance." (Broadnax's brief to this Court at p. 29.)
"`In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under  13A-5-49(8) is that for a crime to fit within that section it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
"`. . . .
"`... [O]n the issue of aggravating circumstances, Bankhead suggests that the jury should have had the opportunity to compare the capital offense in this case with other capital offenses for purposes of  13A-5-49(8).
"`Although a very narrow and literal reading of the statute may suggest that such a comparison is required, it would be virtually impossible for the court to implement. Charging the jury on pertinent facts of "other capital cases" would unduly burden the court. It would be unworkable for the court and would thoroughly confuse the jury.
"`This Court has decided upon an approach for the purposes of  13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was "especially heinous, atrocious or cruel," the court uses the Kyzer standard. Capital offenses falling under  13A-5-49(8) are pursuant to the Kyzer standard, those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Kyzer, 399 So.2d at 334.'
"Ex parte Bankhead, 585 So.2d 112, 124-125 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993)."
Hutcherson v. State, 727 So.2d 846, 859 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).
After defining the terms "heinous," "atrocious," and "cruel," the trial court stated:

*210 "However, it is not enough that the capital felony or capital offense committed by the defendant be heinous, atrocious, or cruel as those terms have been just defined. The capital offense must have been especially heinous, atrocious, and cruel. And not every capital offense is especially so.
"Now, what is intended to be included in these aggravating circumstances are those capital offenses which were the actualÔÇöwhere the actual commission of the capital offense was accomplished by such additional act as to set the crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous, atrociousÔÇöor atrocious, any brutality which was involved in it must have exceeded that which is normally present in any capital offense.
"For a capital offense to be especially cruel, it must be conscienceless or a pitiless crime which was unnecessarily torturous to the victim. And as I told you, the burden is on the State of Alabama to so convince you from the evidence in this sentence hearing beyond a reasonable doubt and to a moral certainty that these matters did exist before you can consider that aggravating circumstance in fixing punishment in this matter."
(Vol.VIII, R. 346-47.)(Emphasis added.)
The trial court's charge complies with the Kyzer standard. The trial court specifically informed the jury that this aggravating circumstance was limited to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." This standard has been consistently held to adequately narrow this circumstance as required by the Eighth Amendment. See Price v. State, supra. We recognize that the instruction omitted the phrase "compared to other capital offenses." However, when the instruction is viewed in its entirety, the instruction effectively narrowed this circumstance and informed the jury that it could find this aggravating circumstance to exist only if it concluded that the "capital offense was especially heinous, atrocious or cruel compared to other capital offenses." Therefore, reversal is not warranted.

B.
Broadnax contends that the "trial court improperly instructed the jury that a death sentence was the presumptive correct sentence." (Issue VI.A.ii. in Broadnax's brief to this Court at p. 32.)
At the beginning of the penalty-phase proceeding, the trial court stated the following to the jury:
"Now, what the sentencing hearing is, is a hearing similar to the guilt phase of the trial. I have never known one to take that long, but usuallyÔÇöwell, I don't know what evidence will be presented. But what will be presented will be aggravating circumstances presented by the State, which would tend to cause the jury to return a verdict recommending death by electrocution and mitigating circumstances as presented by the defense, which would tend to try to get the jury to return a verdict findingÔÇöor imposing life in the penitentiary without parole."
(Vol.VIII, R. 301-02.) According to Broadnax, the statement concerning mitigating circumstances constituted an improper comment on the evidence by the trial court and "placed a burden on [him] to present evidence to try to get the jury to impose life without parole." (Broadnax's brief to this Court at p. 32.)
As the state pointed out in its brief to this Court, the trial court's comments were not part of the trial court's penalty-phase instructions to the jury, but *211 were given at the beginning of the penalty phase as an "attempt to describe to the jury what to expect in the next phase of trial." (State's brief to this Court at p. 51.) We reject Broadnax's contention that the trial court's comment created a presumption of death. Moreover, during his penalty-phase instruction to the jury, the trial court stated:
"While it is your duty to follow the instructions which the Court has given you, no statement, question, ruling, remark, or other expression that I have made at any time during this trial, either during the guilt phase or during the sentence hearing is intended to indicate any opinion of what the facts are or what the punishment should be.
"It is your responsibility to determine the facts and fix the punishment; and in doing so, you should not be influenced in any way by what you may imagine to be my views on such subject."
(Vol.VIII, R. 355.) Any misunderstanding that may have been caused by the trial court's earlier comment was cured by this instruction. Furthermore, during its charge, the trial court repeatedly told the jury that the burden to prove any aggravating circumstances rested with the state and that it must determine that the aggravating circumstances outweighed the mitigating circumstances before it could recommend death. Thus, we conclude that no plain error occurred.

C.
Broadnax contends that the trial court trivialized the jury's responsibility by informing it that its recommendation regarding punishment was an advisory verdict. According to Broadnax, "the court impermissibly lightened the jury's sense of responsibility" in violation of the United States Supreme Court's decision in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). (Issue VI. A.iii. in Broadnax's brief to this Court at pp. 34-35.)
This Court addressed this same issue in Wilson v. State, supra, stating:
"`Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was "advisory" and a "recommendation" and that the trial court would make the final decision as to sentence does not violate Caldwell. "Comments which accurately explain the respective functions of the Judge and jury are permissible under Caldwell `as long as the significance of [the jury's] recommendation is adequately stressed.'" Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.1987), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr. App.1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: "The trial judge's and prosecutor's remarks clearly defined the jury's role in *212 the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra."'"
Wilson v. State, 777 So.2d at 884, quoting Martin v. State, 548 So.2d 488, 494 (Ala. Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
We have reviewed the trial court's penalty-phase charge and we conclude, as we did in Wilson, that the trial court's explanation to the jury of its role in the sentencing scheme did not violate Caldwell. We find no reversible error.

D.
Broadnax contends that the trial court incorrectly instructed the jury with regard to its consideration of mitigating circumstances. (Issue VI.A.iv. in Broadnax's brief to this Court.) Broadnax did not object to the trial court's penalty-phase instruction to the jury; therefore, we review it for plain error. Rule 45A, Ala. R.App.P.
This Court has consistently stated that the trial court must provide the jury with clear, accurate instructions about mitigating circumstances and the opportunity to recommend a sentence of life imprisonment without parole. Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), aff'd in pertinent part, 500 So.2d 1179 (Ala.1985).
Section 13A-5-45(g), Ala.Code 1975, provides:
"The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
See also Dill v. State, 600 So.2d 343, 362 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
The trial court charged the jury concerning mitigating circumstances as follows:
"[THE COURT]: Now, instructing you on aggravating or mitigating circumstances, that does not assume or mean to assume as true any matter referred to in these instructions concerning aggravating or mitigating circumstances, but it leaves, instead to you, for you to determine what the facts are and what the punishment should be.
". . . .
"Now, the law of this State provides a list of some of the mitigating circumstances which you may consider. But that list is not a complete list of the mitigating circumstances you may consider. There are others I will instruct you on later.
"Now, by reading the list of these mitigating circumstances on which you may consider from the evidence orÔÇöat trial of the guilt phase of the sentencing hearing, this is not to say that the CourtÔÇöit is not the Court saying that these mitigating circumstances do exist, but these are statutory mitigating circumstances on which I charge you and for you to consider. And these mitigating circumstances must be only established from the evidence only to your reasonable satisfaction....
". . . .
"Now, in addition to these seven mitigating ÔÇöstatutory mitigating circumstances *213 that I have just given to you, you may also consider as a mitigating circumstance any aspect of the defendant's character and life and any of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death.
"Mitigating circumstance does not have to be included in the list which I have read to you in order for it to be considered by you. A mitigating circumstance considered by you should be based on the evidence you have heard.
"If you are satisfied from the evidence presented during the guilt stage of the trial or during the sentence hearing that a mitigating circumstance exists in this case, then you may consider it. A mitigating circumstance need merely be proven to your reasonable satisfaction and not beyond a reasonable doubt and to a moral certainty.

". . . .
"Now, ladies and gentlemen, if after a fair consideration of all of the evidence in this case as to the sentencing hearing, if you are convinced beyond a reasonable doubt to a moral certainty that aggravating circumstances do exist and that they outweigh, or that there are no mitigating circumstances proven to your reasonable satisfaction, the form of your verdict should be: `We, the jury, fix the punishment of the defendant, Donald Broadnax, as death by electrocution.'
". . . .
"If you are reasonably satisfied as to the existence of any mitigating circumstances, and if, in your judgment, those mitigating circumstances outweigh the aggravating circumstancesÔÇöand again, let me say this: It is not the number of aggravating circumstances versus mitigating circumstances, or mitigating circumstances versus aggravating circumstances, but the seriousness of the aggravating circumstances and the mitigation as shown to your reasonable satisfaction. And that is the weighing factor, not the numerical count, but as to the seriousness of the aggravation and the mitigation of mitigating circumstances.
"And if you are reasonably satisfied that mitigating circumstances exist and that they outweigh the aggravating circumstances, then the form of your verdict should be: `We, the jury, fix the punishment of Donald Broadnax at life imprisonment without parole.'"
(R. Vol. VIII at 342-57.)(Emphasis added.)
In its instruction to the jury, the trial court repeatedly instructed the jury that it had to be "reasonably satisfied" that a mitigating circumstance existed. Section 13A-5-45(g), Ala.Code 1975, however, provides that the defendant's burden is only to inject the mitigating circumstance. If the state contests the factual existence of an injected mitigating circumstance, then the state has the burden of disproving the existence of the mitigating circumstance by a preponderance of the evidence. This Court approved the following instruction with regard to mitigation in Hooks v. State, 534 So.2d at 362-63:
"`A mitigating circumstance considered by you should be based on the evidence you've heard with the factual existence of an offered mitigating circumstance in dispute. The State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. The burden of disproving it is by a preponderance of the evidence, and that means that you are to consider the mitigating circumstance does exist unless taking the evidence as a whole it is more likely than not that the mitigating circumstance does not exist.'"
*214 (Emphasis added.) The trial court in this case did not instruct the jury on this principle of law. The defendant has the burden of interjecting a mitigating circumstance; he does not, as the trial court's instruction suggests, have to establish the existence of a mitigating circumstance to the reasonable satisfaction of the jury. Thus, the trial court's instruction was erroneous.
An erroneous instruction during the penalty phase of trial, however, does not necessarily mandate a reversal.
"In Alabama, `the harmless error rule does apply in capital cases at the sentence hearing.' Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). However, it `is to be applied with extreme caution in capital cases,' and this caution must be observed when reviewing error in the penalty phase, for `after all, it is the penalty which distinguishes these cases from all other cases.' Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala. 1984).
"To determine whether the trial court's failure to instruct properly was harmless error, ... [this Court may consider] whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. See also Henry v. Wainwright, 721 F.2d 990, 995 (5th Cir.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374,80 L.Ed.2d 846 (1984) (wherein the court, in holding harmless the trial court's failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that `for the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict')."
Lawhorn v. State, 581 So.2d 1159, 1176-77 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). See also White v. Dugger, 523 So.2d 140 (Fla. 1988), cert. denied, 488 U.S. 871, 109 S.Ct. 184, 102 L.Ed.2d 153 (1988)(stating that erroneous instructions to the jury restricting its consideration of mitigating circumstances may be found harmless if the evidence supporting the mitigating circumstances did not affect the jury's recommendation or the trial court's consideration).
At the sentencing hearing, the state argued the existence of the following aggravating circumstances:
1. that the capital murder was committed by a person under sentence of imprisonment, see  13A-5-49(1), Ala. Code 1975;
2. that Broadnax had previously been convicted of a felony involving the use or threat of violence, see  13A-5-49(2), Ala.Code 1975;
3. that the capital offense was committed while Broadnax was engaged in a kidnapping, see  13A-5-49(4), Ala.Code 1975; and
4. that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see  13A-5-49(8), Ala.Code 1975.
The jury's verdicts from the guilt phase of Broadnax's trial established beyond a reasonable doubt the aggravating circumstances that the capital offense was committed during a kidnapping and that Broadnax had committed the capital offense after having been convicted of a felony involving the use or threat of violence, i.e., murder. See Coral v. State, 628 So.2d at 965-66.
Additionally, the evidence presented during the guilt phase of trial was uncontroverted that Broadnax was serving a sentence of imprisonment at the time of *215 the offenses. The state also argued that the killings of Jan and DeAngelo were "especially heinous, atrocious, or cruel" because of the "nature of the killings" and because of the extensive mental anguish suffered by DeAngelo before his death. The state emphasized the testimony during the guilt phase of Dr. Brissie that Jan's and DeAngelo's wounds indicated that they were lying on the ground defenseless when they were stabbed. The state reiterated Dr. Brissie's testimony that Jan received at least 13 head wounds and that DeAngelo's skull was brutally crushed. The state further argued that because the evidence indicated that DeAngelo saw his grandmother, Jan, being beaten and then had to ride in terror for approximately one and a half hours before Broadnax decided to kill him, DeAngelo's murder was especially heinous, atrocious, or cruel as compared to other capital offenses.
Broadnax argued the existence of the mitigating circumstance that the capital offense was committed while he was under the influence of extreme mental or emotional disturbance. See  13A-5-51(2), Ala.Code 1975. To support the existence of this mitigating circumstance, Broadnax relied on the evidence presented during the guilt phase that the murders were committed shortly after he had been denied parole.
Broadnax presented evidence in support of nonstatutory mitigating circumstances through the testimony of his sister, Dorothy McKinstry. McKinstry testified that she did not grow up with Broadnax, but that when Broadnax was 15 years old, he moved to Michigan to live with her family for approximately one year because he was having problems in school and in the community. McKinstry stated:
"There was a problem there. Donald, when he came to stay with me, Donald was placed into special ed[ucation] class there. And Donald was having problems. It was really thatÔÇöthere wasn't too many friends that I knew of Donald had of. When he was in school there with me, Donald would come home every day and eat. He wouldn't eat lunch with the class there in the school lunchroom with the other kids. And he would always come home and walk back to school. And he had no friends. There was no friends that I knew that he was affiliated with.
". . . .
"The problem that he had in the houseÔÇöin my home with my children. Well, they were problems like kids would do. You know, argue about different things. And he would pout in a manner like that.
". . . .
"As far as Donald having a life like that I had, Donald didn't have that. Donald didn't have social life like my children or the average child would have, involved in things, no, he didn't have that. As far as having things, he didn't have that; where a child would have bicycles, a child would have toys, a child would be able to goÔÇöwas going out to play ball. Donald didn't haveÔÇöhe didn't have the advantages that I had or that I had given my children. No, he didn't have a childhood.
"No. 1, my momÔÇöthey weren't able to give it to him.
"No. 2, my father wasÔÇöat that particular time, my father was very ill. And my mother was taking care of my father. My brother and my sister were young at the time, themselves, so they weren't, say, weren't able to be the help to Donald that if I had been living here could have been, because they were minor children themselves. And that wasÔÇö that's just the way it was.

*216 "They had to adjust and live with what they had, with the means that they had. And it wasn't very much. That wasÔÇöhis living that he was making at that time, he was riding the popsicle wagon, and he sold popsicles. That was the way they were being provided on, and my mother was doing."
(R. 314-19.)
We have carefully reviewed the evidence presented by the state in support of the aggravating circumstances and the evidence presented by the defense in mitigation. The evidence in support of the aggravating circumstances is overwhelming; the evidence in support of the mitigating circumstances is minimal. In light of the overwhelming evidence presented in support of the aggravating circumstances, there is no question, that, had the jury been properly instructed, it would still have recommended death as the penalty. The facts presented to the jury established, beyond any doubt, that the aggravating circumstances clearly outweighed the mitigating circumstances. Even if the jury had been properly instructed and had found that the mitigating circumstances existed, the aggravating circumstances overpower any mitigation. Because we conclude that the evidence, as presented, conclusively establishes, that no rational jury, properly instructed, could have found otherwise, the trial court's erroneous instruction was harmless. Cf. Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App. 1983), aff'd, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)(a finding of harmless error is appropriate where the facts indicating the death penalty are "`so clear and convincing that virtually no reasonable person could differ'").
We note that this situation does not involve the jury's consideration of misleading, inaccurate, or illegal information or evidence. Rather, it is a case where the mitigating circumstances, may have been improperly negated. However, we find that despite the fact that the jury was improperly instructed and perhaps mitigating evidence that should have been properly considered was negated, this error did not render Broadnax's sentencing fundamentally unfair. It is unnecessary to vacate Broadnax's death sentence because we are convinced that, had the burden of proof for establishing mitigating circumstances been properly defined, the jury would have recommended the same sentence. The purpose of the harmless error rule is to avoid setting aside a sentence for defects the correction of which would have little, if any, likelihood of changing the result of sentencing. Davis v. State, 718 So.2d 1148 (Ala.Cr.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).
We recognize the utmost importance of ensuring that a death sentence is not based on arbitrary and capricious action. We conclude, however, that the facts of this case support a determination that the trial court's instruction regarding mitigating circumstances was harmless and that the jury's sentence of death was not based on arbitrary and capricious action. Two statutory aggravating circumstances were established by the jury's verdict from the guilt phase of trial; evidence of another aggravating circumstance was uncontroverted; the evidence that the capital offense was "especially heinous, atrocious or cruel as compared to other capital offenses" was overwhelming. Based on the evidence presented, we cannot conclude, even though the trial court's instruction was erroneous, that the jury's weighing of the mitigating circumstances and aggravating circumstances was erroneous. See Tafero v. Dugger, 873 F.2d 249 (11th Cir. *217 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1834, 108 L.Ed.2d 962 (1990)(it was harmless error not to charge the jury on nonstatutory mitigating circumstances when there was no reasonable probability that the jury would have reached a different result had it been given such an instruction); Ford v. Dugger, 522 So.2d 345 (Fla.1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 823 (1989).

E.
Broadnax contends the trial court's penalty-phase instructions to the jury were incomplete because the trial court did not "instruct the jury on reasonable doubt [and] on the elements of the aggravating circumstances." (Issue VI. B.v. in Broadnax's brief to this Court at pp. 37-38.) According to Broadnax, these omissions in the instruction relieved the state of its burden to prove the aggravating circumstances beyond a reasonable doubt.[16]
During the trial court's penalty-phase instructions, the trial court stated:
"In charging you, I want to remind you of the instructions that I gave you earlier in theÔÇöor yesterday when I charged you as to the law concerningÔÇö the basic law concerning the terms `reasonable doubt' and `moral certainty' and as your other functions as a juror.
"If any of you feel necessary, I can recharge you as to each and every one of those elements. But if you do not indicate otherwise, then I will not. And I will not charge you as to the elements of the offense included in the indictment, because the question at that point is moot, because by your findings, you have found the defendant guilty of those counts as charged in the indictment.
"In the sentencing hearing, you may consider my charge to you as I have previously given it to you, and you may also consider all of the evidence that was introduced at the guilt phase of the trial. You may consider that evidence in considering any aggravating or any mitigating circumstances.
". . . .
"Now, the law of this State provides a list of aggravating circumstances that may be considered by the jury in fixing punishment, if the jury is convinced beyond a reasonable doubt from the evidence that such aggravating circumstances exist in the case. And the same definitions that I gave to you yesterday concerning reasonable doubt apply in this matter and in this phase of the hearing also.
"If the jury is not unanimously convinced beyond a reasonable doubt based upon the evidence that one or more such aggravating circumstances exist, then the jury must fix the defendant's punishment as life imprisonment without parole, regardless of mitigating circumstances in the case.
"Now, the list of aggravating circumstances provided by law, there are four circumstances which you may consider in this case, if you are convinced beyond a reasonable doubt and to a moral certainty based on the evidence that certain circumstances do exist.
"Now, the fact that I instruct you on such aggravating circumstances or define them for you does not mean that the circumstances or any other aggravating circumstances have been proven beyond a reasonable doubt in this matter.

*218 "Whether any aggravating circumstance on which I instruct you or define for you has been proven beyond a reasonable doubt based on the evidence in this matter, is for you, the jury, for you and you alone, to determine.
"Now, listing and in defining some of the aggravating and mitigating circumstances in the instructions, I will use the term `capital felony.' The term capital felony is actually synonymous with capital offense. It means a crime for which one possible punishment is death. The aggravating circumstances which you may consider in this case, if you unanimously find from the circumstances proved or proven beyond a reasonable doubt are as follows:
"1) That the capital offense was committed by a person under sentence of imprisonment;
"2) That the defendant was previously convicted of a felony involving the use or threat of violence to a person;
"3) That the capital offense was committed while the defendant was engaged in the commission of an attempt to commit kidnapping; and,
"4) That the capital felony was especially heinous, atrocious, or cruel.
". . . .
"Now, as I have stated to you before, the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment in this case.
". . . .
"In deciding whether the State has proven beyond a reasonable doubt the existence of any given aggravating circumstances, you should bear in mindÔÇö and I repeat again the definition I gave to you yesterday as to reasonable doubtÔÇöthe evidence upon which a reasonable doubt about an aggravating circumstance may be based is evidence about the circumstance including both the evidence you heard in the guilt stage of the trial and the evidence you heard in the sentence hearing. The defendant does not have [to] disprove anything about an aggravating circumstance. The burden is wholly upon the State to prove such circumstance beyond a reasonable doubt."
(Vol.VIII, R. 341-45, 347-48.)
In Griffin v. State, supra, this Court addressed similar circumstances, stating:
"While we do not wish to be seen as approving the practice during the penalty phase of merely referring to instructions previously given during the guilt phase of a capital murder trial, we conclude that in this case the trial court's reference during the sentencing phase to its previous instruction on reasonable doubt without explicitly instructing on reasonable doubt was not plain error.
"The trial court gave a detailed definition of reasonable doubt during the guilt phase at approximately 5:00 p.m. and then referenced his instruction the following morning at approximately 11:00 a.m. Only a short timeÔÇöless than 24 hoursÔÇölapsed between the instructions. Additionally, the trial court asked the jury if it needed to reinstruct on reasonable doubt and no one indicated that he did not remember the previous instruction. `"It is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge."' Collins v. State, 611 So.2d 498, 503 (Ala.Cr.App.1992), quoting Brannon v. State, 549 So.2d 532, [541-42] (Ala.Cr.App.1989), quoting Davis v. State, 440 So.2d 1191, 1195 (Ala.Cr.App.1983), cert. denied, 465 U.S. *219 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984).
"Moreover, we find it significant that the instruction on reasonable doubt during the sentencing phase was only applicable, as the trial court instructed, to the finding of the existence of the aggravating circumstances. Reasonable doubt is the state's burden of proof in establishing the aggravating circumstances. Because the jury found Griffin guilty of capital murder, the aggravating circumstance that the murder was committed for pecuniary gain was established as a matter of law. The trial court repeatedly instructed the jury that if it was not convinced beyond a reasonable doubt by the evidence that an aggravating circumstance existed then it must conclude that the punishment must be life imprisonment without parole....
". . .
"Viewing the trial court's instruction as a whole, we conclude that the trial court's instruction was adequate to instruct the jury on the state's burden of proof with regard to proving aggravating circumstances. The trial court's reminding the jurors of the prior instruction and inquiring to see if there were any questions regarding that instruction provided an adequate instruction on the reasonable doubt standard. Thus, we find no plain error in the court's instruction. See Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), aff'd, Ex parte Boyd, 715 So.2d 852 (Ala.1998), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998)."
790 So.2d at 338-39.
As in Griffin, the trial court provided a detailed definition of reasonable doubt during the guilt phase at approximately 4:25 p.m. and then referenced his instruction the following morning at approximately 11:30 a.m. Only a short timeÔÇöless than 24 hoursÔÇölapsed between the instructions. The trial court asked the jury if it needed to reinstruct it on reasonable doubt and no juror indicated that he or she did not remember the previous instruction. The trial court's procedure of reminding the jurors of the prior instructions and inquiring to see if there were any questions ensured that the jury had adequately been instructed on the reasonable doubt standard.[17]
Furthermore, the instruction on reasonable doubt applied to the state's burden of establishing the aggravating circumstances. Two of the aggravating circumstances were established by law when the jury returned its verdict during the guilt phase, and the aggravating circumstance that the offense was committed while Broadnax was serving a term of imprisonment was uncontroverted. Thus, viewing the trial court's instruction as a whole, we conclude that the trial court's instruction was adequate to instruct the jury on the state's burden of proof with regard to proving aggravating circumstances. We find no plain error.
Broadnax further argues that the trial court's failure to instruct the jury concerning the elements of  13A-5-49(1), Ala.Code 1975 (capital murder committed by a person under a sentence of imprisonment);  13A-5-49(2), Ala.Code 1975 (capital murder committed after the defendant has been previously convicted of a felony involving the use of violence to the person); and  13A-5-49(4), Ala.Code 1975 (capital murder committed while the defendant was engaged in the commission of a kidnapping), unconstitutionally relieved *220 the state of its burden of proving these circumstances beyond a reasonable doubt.
Section 13A-5-45(e), Ala.Code 1975, states:
"At the sentencing hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the jury convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
(Emphasis added.)
Because the jury had previously convicted Broadnax of capital murder on all counts, it had found, as a matter of law, the existence of the aggravating circumstances that the capital murder was committed after the defendant has been previously convicted of a felony involving the use of violence to the person and that the capital murder was committed while the defendant was engaged in the commission of a kidnapping. See Griffin v. State, supra. The evidence was uncontroverted that the murders occurred while Broadnax was under a sentence of imprisonment. Thus, Broadnax has not shown how he was prejudiced by the trial court's failure to explicitly instruct on the elements of each of these aggravating circumstances. We, therefore, conclude that error, if any, in the trial court's failure to instruct the jury on those elements of aggravating circumstances is harmless.

XXIV.
Broadnax contends that the cumulative effect of all the errors he alleges on appeal entitles him to a new trial. (Issue XXV in Broadnax's brief to this Court.) We disagree.
"Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.1998)."
Burgess v. State, 811 So.2d 557, 614 (Ala. Cr.App.1998), rev'd on other grounds, 811 So.2d 617 (Ala.2000). See also Frazier v. State, 758 So.2d 577 (Ala.Cr.App.1999); Smith v. State, 756 So.2d 892, 904 (Ala.Cr. App.1998); Mack v. State, 736 So.2d 664 (Ala.Cr.App.1998); Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App.), aff'd, 630 So.2d 125 (Ala.1993); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App.1989); and McNeely v. State, 524 So.2d 375 (Ala.Cr.App. 1986).
We have reviewed each allegation of error Broadnax raises on appeal concerning his convictions and the penalty-phase sentencing hearing before the jury; we have searched the record for plain error. We find no reversible errors with regard to his convictions and the penalty-phase hearing before the jury. Accordingly, we conclude that the cumulative effect of these alleged errors does not warrant a reversal of his conviction. See Burgess, supra.

XXV.
Broadnax contends that his sentence of death was improper because, he says, the trial court made incorrect factual and legal findings in its sentencing order. (Issue II in Broadnax's brief to this Court.) Specifically, Broadnax claims that the trial court failed to consider the mitigating evidence he presented during the penalty phase of trial. The state, in its brief to this Court, concedes that remand is necessary because the trial court's sentencing order is "flawed" in that it fails to fully comply with  13A-5-47(d), Ala.Code 1975.
Section 13A-5-47(d), Ala.Code 1975, states:

*221 "Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in  13A-4-49, each mitigating circumstance enumerated in  13A-5-51, and any additional mitigating circumstances offered pursuant to  13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it."
This Court has recently held that:
"`A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors.' Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)(quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to present any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala. 1992). Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 ( [Ala.] 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App. 1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."
Ingram v. State, 779 So.2d 1225, 1246 (Ala. Cr.App.1999).
The record reflects that Broadnax called McKinstry to testify on his behalf during the penalty phase of trial. The trial court's sentencing order does not acknowledge that McKinstry testified and does not indicate what, if any, mitigating evidence was presented through her testimony. In addition, the sentencing order does not specifically address the existence or nonexistence of each of the aggravating circumstances provided in  13A-5-50, Ala.Code 1975; the existence or nonexistence of each of the mitigating circumstances provided in  13A-5-51, Ala.Code 1975; or the existence or nonexistence of any nonstatutory mitigating circumstances provided in  13A-5-52, Ala.Code 1975.
After reviewing the trial court's sentencing order and the record on appeal, we agree with the state that remand is necessary for the trial court to correct certain errors and omissions in its sentencing order. Therefore, this cause is remanded with instructions that the trial court 1) review those portions of the record concerning the penalty phase of trial,[18] 2) make new findings regarding each of the aggravating circumstances and the mitigating circumstances, 3) weigh those aggravating *222 and mitigating circumstances and determine whether the aggravating circumstances outweigh the mitigating circumstances, and 4) enter a proper sentencing order as required by  13A-5-47(d), Ala.Code 1975. No new sentencing hearing is required. See Part XXIII.D. of this opinion. The trial court is granted the authority to resentence Broadnax in the event the court determines that death is not the appropriate sentence. See Parker v. State, 587 So.2d 1072 (Ala.Cr.App.1991), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). A return should be made to this Court within 35 days from the date of this opinion.
Broadnax's convictions are affirmed; this cause is remanded for the trial court to issue a new sentencing order. The trial court shall take all directed action in sufficient time to permit the circuit clerk to make a proper return to this Court within 35 days of the release of this opinion.
OPINION OF MARCH 31, 2000, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING GRANTED; RULE 39(k) MOTION DENIED; AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
LONG, P.J., and McMILLAN and BASCHAB, JJ., concur; COBB, J., concurs specially, with opinion.
COBB, Judge, concurring specially.
I concur with the majority's decision to affirm Broadnax's conviction and to remand the case for the entry of a proper sentencing order. However, I write separately as to Part XXIII.D., in which Broadnax argues that he is entitled to have his death sentence reversed because, he says, the trial court gave an incorrect instruction regarding the burden of proof in finding the existence of a mitigating circumstance during sentencing.
It is clear to me that the trial court's repeated instruction to the jury that a mitigating circumstance must be established to the jury's "reasonable satisfaction" is an incorrect standard. A correct instruction to the jury concerning the existence of mitigating circumstances would be consistent with the following instruction:
"A mitigating circumstance considered by you should be based on the evidence that you have heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by the preponderance of the evidence. The burden of disproving it by a preponderance of the evidence means that you are to consider [that] the mitigating circumstance exists unless, taking the evidence as a whole, it is more likely than not that the mitigating circumstance does not exist."
Gaddy v. State, 698 So.2d 1100, 1143 (Ala. Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997).
Under most circumstances, the trial court's incorrect instruction could have improperly shifted the burden of proof concerning mitigating circumstances and could have affected how or whether the jury considered any proffered mitigating circumstances. Because of its possible effect, I believe that such an incorrect instruction would, in most cases, require that we remand the case for a new sentencing hearing. However, I agree with the majority that, under the unique circumstances of this case, the aggravating circumstances were so numerous and so overwhelming, when weighed against all of Broadnax's proffered mitigating circumstances, as to make the trial court's error harmless.
*223 The State presented uncontroverted evidence that Broadnax committed these murders while he was under a sentence of imprisonment; that, at the time of these murders, he had previously been convicted of murder, a felony involving the use of violence; and that he committed these crimes while engaged in a kidnapping. Moreover, the State also presented compelling evidence that showed Broadnax's acts of murder to be especially heinous, atrocious, or cruel. The evidence indicates that Broadnax viciously beat his wife, Jan, to death with his fists and with wooden sticks in the presence of her four-year-old grandson. The evidence indicates that Broadnax then stuffed his wife's body into the trunk of her automobile and drove the automobile from his prison work-release workplace, with her grandson in the car with him. After taking the four-year-old from the scene of his first murder, Broadnax then beat the young child to death with such force that it caused the top of his brain to be ripped and lacerated. The bodies of the child and his grandmother were discovered in the trunk of her abandoned automobile. It boggles the mind to consider the terror of a small child abducted by a man whom he had just watched brutally beat his grandmother to death, realizing he was about to meet the same grizzly fate.
As I weigh these aggravating factors against the emotional distress Broadnax experienced when his parole was denied, and the mitigating circumstances of his unhappy and disadvantaged childhood, I cannot conclude that the trial court's incorrect instruction on mitigating circumstances had any effect at all on the ultimate sentence recommendation of the jury or the determination of an appropriate sentence by the trial court. See Tafero v. Dugger, 873 F.2d 249 (11th Cir.1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1834, 108 L.Ed.2d 962 (1990). For this reason, I concur with the majority's conclusion that the faulty instruction was harmless error.

On Return to Remand
FRY, Judge.
We originally remanded this cause to the trial court with directions that that court correct factual errors in its sentencing order and that it enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in  13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in  13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to  13A-5-52. See Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000). The trial court has complied with those directions and has submitted a sentencing order on return to remand that satisfies the statutory requirements and sentences Broadnax to death.[1]

I.
Broadnax contends that Alabama's method of execution, the electric chair, constitutes cruel and unusual punishment, and that it thereby violates the Eighth Amendment to the United States Constitution. Alabama's method of execution has withstood repeated constitutional attacks. See Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ *224 (Ala.Cr.App.1999); Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Wright v. State, 494 So.2d 726 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987).

II.
As we are required to do by  13A-5-53, Ala.Code 1975, we determine the propriety of Broadnax's conviction and the sentence of death. Broadnax was indicted and convicted of four counts of capital murder, including the murder of two or more persons pursuant to one scheme or course of conduct, see  13A-5-40(a)(10); murder by a defendant who has been convicted of another murder in the 20 years preceding the crime, see  13A-5-40(a)(13); murder during a kidnapping in the first degree, see  13A-5-40(a)(1); and murder of a victim less than 14 years old, see  13A-5-40(a)(15).
The record indicates that Broadnax's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.  13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found the following statutory aggravating circumstances: that the capital offense was committed by a person under a sentence of imprisonment,  13A-5-49(1); that the capital offense was committed by a person after he had previously been convicted of a felony involving the use or threat of violence to a person,  13A-5-49(2); that the capital offense was committed while a person was engaged in the commission of or an attempt to commit kidnapping,  13A-5-49(4); and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses,  13A-5-49(8).
In support of its finding that the capital offense was especially heinous, atrocious, or cruel, the trial court stated:
"The especially heinous, atrocious, [or] cruel aggravating circumstance pursuant to 13A-5-49(8) was well established [by the evidence] which showed that the victim, Hector J. Stamps was brutally murdered in the presence of her grandson, DeAngelo Stamps and immediately after the murder, the victim, DeAngelo Stamps's grandmother, was stuffed into the trunk of the automobile and driven from the scene of the first murder approximately one and a half hours away to the scene of the second murder where the four-year-old grandson, DeAngelo Stamps, was brutally murdered. The manner in which the death of the grandmother was caused in the presence of the four-year-old grandson and the manner in which the death of the four-year-old grandson ensued and the terror inflicted on the mind of the four year old grandson raises this crime to a [conscienceless] and pitiless crime which was unnecessarily torturous to the victim and, therefore, fell into the category of especially heinous, atrocious, [or] cruel."
(Amended Order on Remand R. 13-4.) The trial court's factual findings are supported by the record. Broadnax v. State, 825 So.2d at 209-10 (detailing the ample evidence presented by the state in support of this aggravating circumstance). The trial court correctly applied the narrow interpretation of this aggravating circumstance as set forth in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). Cf. Barbour v. State, 673 So.2d 461, 471 (Ala.Crim.App. 1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996)(noting that to support the finding the trial court relied on the fact *225 that the victim was savagely beaten, was defenseless, and suffered physical pain and psychological fear); Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990)(recognizing that the fear experienced by the victim before death is a significant factor in determining the existence of this aggravating circumstance); Thomas v. State, 539 So.2d 375 (Ala.Crim.App.), aff'd, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989); and Musgrove v. State, 519 So.2d 565 (Ala.Crim.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).
The trial court's order indicates that it considered each of the statutory mitigating circumstances but found that none of them were present. Additionally, the trial court considered the evidence presented by Broadnax's sister in support of nonstatutory mitigating circumstances. The trial court stated:
"The Court, in considering the testimony of the Defendant's sister, even in the most favorable light on behalf of the Defendant found that any mitigating circumstance of an anti-social personality disorder that she may have testified to was greatly out weighed by the aggravating circumstances as presented in the evidence in this case and that even in consideration, if this is a mitigating circumstance, that it is totally outweighed by the aggravating circumstances as presented by the evidence.
"After consideration of all of the matters that were presented to this Court, the testimony heard at trial and the sentencing hearing before this Court, both in mitigation and by aggravation, taking into consideration all other matters that were proffered before this Court as hereinabove stated in this order and disregarding pleas or references to the Court to consider this sentence on basis of passion or prejudice [the] Court does now find and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances and are sufficient to uphold the jury's recommendation of punishment at death."
(Amended Order on Remand R. 18.) The trial court weighed the aggravating circumstances and the mitigating circumstances and sentenced Broadnax to death. We agree with the trial court's findings in the present case.
Pursuant to  13A-5-53(b), Ala. Code 1975, we must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of the death sentence. After an independent weighing, we are convinced that the sentence of death is the appropriate sentence in this case.
Additionally,  13A-5-53(b)(3), Ala.Code 1975, provides that we also must address whether Broadnax's sentence is disproportionate or excessive when compared to the penalties imposed in similar cases. We take judicial notice that similar offenses have been punished with sentences of death. See, e.g., Ex parte Melson, 775 So.2d 904 (Ala.2000); Ex parte Ingram, 779 So.2d 1283 (Ala.2000); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App. 2000); Ex parte Borden, 769 So.2d 950 (Ala.2000); Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000); Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999); Bryant v. State, [Ms. CR-98-0023, Nov. 19, 1999] ___ So.2d ___ (Ala.Crim.App.1999); Ex parte Davis, 740 So.2d 1135 (Ala.1999), cert. denied, 529 U.S. 1039, 120 S.Ct. 1535, 146 L.Ed.2d 349 (2000); Freeman v. State, *226 776 So.2d 160 (Ala.Crim.App.1999); Ex parte Borden, 711 So.2d 506 (Ala.1998), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998); and Siebert v. State, 555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
According to Rule 45A, Ala.R.App.P., we have searched the record for any error that may have affected Broadnax's substantial rights and have found none.
Broadnax's sentence to death is due to be, and is hereby, affirmed.
AFFIRMED AS TO SENTENCE.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.

APPENDIX A

State of Alabama

vs.

Donald Broadnax

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ALABAMA

CASE NO. CC 96-5162

ORDER OF COURT ON IMPOSITION OF DEATH PENALTY
The defendant in this case, Donald Broadnax, was charged by a four (4) count indictment by the Grand Jury of the Circuit Court of the Tenth Judicial Circuit in and for Jefferson County, Alabama with the capital offense of murder, wherein two (2) or more persons are murdered by the Defendant by one act pursuant to one scheme or course of conduct under [Section] 13-5-40(A)(10) of the Alabama Criminal Code. The second count of the indictment charged the Defendant with murder in the instant cause under Section 13A-5-40(A)(1) of the Criminal Code. The third count of the indictment charged the Defendant with murder by the Defendant during a kidnapping in the first degree or an attempt thereof committed by the Defendant under Section 13A-5-40(A)(1) of the Criminal Code. The fourth count of the indictment charges the Defendant with murder when the victim is less than fourteen (14) years of age under Section 13A-5-40(S)(15) of the Alabama Criminal Code.
Subsequent to the indictment being returned by the October 1996 Grand Jury, the case was set for pre-trial on December 13, 1996, and was continued over until March 28, 1997, for pre-trial as the Defendant was in the penitentiary and had to be ordered back for the hearing. The case was ultimately set for trial on June 2, 1997. This case proceeded to trial on June 2, 1997, and a jury of fourteen (14) men and women duly empaneled and sworn as required by law heard the evidence in the case, wherein the jury, after hearing the evidence and being charged as to the applicable law and upon consideration of the law and the evidence and the number of the jury being diminished by two (2) as provided by law, the twelve (12) remaining jurors found the Defendant guilty of the capital offense as charged in each of the four (4) counts of the indictment. The jury was polled and the verdict was unanimous in finding said Defendant guilty of each count of the indictment. The verdict was returned by the jury on June 6, 1997, and was announced by the Court on said date. Subsequent to the jury's finding the Defendant guilty of the capital offense in each count of the indictment, the Court commenced a sentence hearing before the said jury as required by Section 13A-5-45 of the Alabama [Code 1975].
After opening statements made by the attorneys, first by the State and then by the Defense, the State moved that the evidence that was presented in the guilty phase of the proceedings be considered by *227 the jury in the punishment phase of the proceedings, which said motion was granted.
The State presented evidence of four (4) aggravating circumstances, that being that the capital offense was committed by a person under sentence of imprisonment pursuant to [ ]13A-5-49(1) and that the capital offense was committed by the Defendant after he had previously been convicted of a felony involving the use or a threat of violence to a person pursuant to [ ]13A-5-49(2), and further that the capital offense was committed while the Defendant was engaged in the commission of or an attempt to commit a kidnapping pursuant to [ ]13A-5-49(4), and last, that the capital felony was especially heinous, atrocious, and cruel pursuant to [ ]13A-5-49(A).
The Defense presented testimony by the Defendant's sister concerning the manner in which the Defendant was reared and his antisocial behavior during his teenage years.
After summation, first by the State, then by the Defense, the Court then charged the jury that if the mitigating circumstances outweighed the aggravating circumstances as presented to the jury, then the punishment would be fixed at life imprisonment without eligibility for parole, but if the aggravating circumstances outweighed the mitigating circumstances then the punishment would be affixed at death. After due deliberation, the jury returned a verdict fixing the Defendant's punishment at death. The jury was individually polled as to whether the verdict and the enumeration of the verdict as set out on the verdict form was proper and each juror said that that was the proper vote as to punishment of the Defendant and the recommendation of the jury was unanimous and all twelve (12) jurors recommended that the Defendant be sentenced to death.
The Court, in its charge to the jury as to how the mitigating circumstances and aggravating circumstances would be considered in affixing punishment during the punishment phase, advised the jury that emotion, passion, prejudice, or other arbitrary factors should not be considered in arriving at punishment in the verdict. The Court further charged the jury that their deliberations and verdict should be based on the law and the evidence as they had heard during the course of the trial. The Court is satisfied and makes the finding that the element of passion, prejudice or other arbitrary factors were not present in the jury's deliberations in affixing punishment at death. After the jury returned said verdict the Court then announced the jury verdict and set the sentencing hearing for August 29, 1997; however, the case was continued over until September 12, 1997, for sentencing.

FINDING OF FACTS FROM THE TRIAL
After said hearing the Court makes the following findings of facts from the trial:
The homicides which were the basis for the charge as set out in this indictment occurred on April 25, 1996, apparently at two different locations, one occurring at Alexander City in Coosa County and under the finding of facts by the jury by a continuing plan, scheme, and design the second homicide occurred in the Birmingham Division of Jefferson County at 501 3rd Street S.W. in Birmingham, Alabama.
The Defendant, Donald Broadnax had previously been convicted in 1978 for murder and was sentenced to 99 years in the penitentiary. In April of 1996 the Defendant was living in a work release center in Alexander City and working at Wellborn Forest Products in Alexander City.
*228 The victim, Hector J. Stamps Broadnax, married the Defendant in 1995 in Alexander City. The second victim, DeAngelo Stamps was a four year old grandson of the first victim, Hector J. Stamps Broadnax.
On April 25, 1996, at approximately 8:40 p.m. witness Robert Williams and his wife left their home at 300 St. Charles Avenue S.W. to go to McDonald's [restaurant] on Lomb Avenue. The house across the street from Williams at 501 3rd St. S.W. was abandoned and the neighbors have had problems with it being used as a crack/prostitution house. When they left home at 8:40 p.m. there was no car parked behind the house but when they returned to their home at approximately 8:50 p.m. they saw a white Dodge Aries parked behind the house. Because of previous problems with said house, witness Williams called 911 and reported the case. Birmingham Police Department Officers McCurdy and Smith arrived at approximately 9:00 p.m. and saw blood on the ground behind the car and on the trunk and saw a piece of blue cloth with blood on it on the ground. They called paramedics and secured the scene. When the paramedics arrived they opened the lock on the trunk and found both of the victim's bodies in the trunk. The car in which the two bodies were found belonged to the victim, Hector J. Stamps Broadnax. Both victims had been beaten to death and the cause of death was described by Coroner Robert Brissie as blunt-force trauma, which could have been caused by the use of a piece of lumber as that found in the trunk of the car in which the two victims' bodies were found.
In the late afternoon at approximately 6:00-6:30 it appeared, from the evidence, that the victim, Hector J. Stamps Broadnax had brought food to the Defendant at his workplace and had brought her grandson, the other victim, DeAngelo Stamps, with her. It further appeared, from the evidence, that a disagreement occurred and the evidence further showed that in an area to the rear of the workplace of the Defendant at a location outside a finishing products storage facility that an area of discoloration with apparent burning was located; in the immediate area of the burned area was an earring that matched an earring in the trunk of the car where the victim's body was located. It would appear from the evidence that the victim, Hector J. Stamps Broadnax, was killed at this scene and her body dumped into the car as a witness observed the Defendant driving the victim's car between the hours of 6:30-7:00. The second victim, DeAngelo Stamps was seen in the child's seat in the back of the car and was alive at the time.
At approximately 10:45-11:00 p.m. the same night witness Mark Chastain, who was an employee at Wellborn Forest Products, was locking up the building and setting the alarm when he realized an individual was still inside the building. While he was locking up the building and setting the alarm his wife Cathy Chastain was outside the building waiting on him in their automobile and she saw an individual matching the Defendant's description get out of a light-colored truck with writing on the side of the truck and she saw this individual run inside and into the building. When witness Mark Chastain realized someone was inside the building [and] asked who was there, the Defendant responded and at that, witness Mark Chastain told him that the alarm had been set and that they needed to exit the building immediately as they only had a short period of time before the alarm would be activated. Witness Mark Chastain asked the Defendant how he had gotten there and the Defendant told him that the work release van had *229 dropped him off. As they left, the Defendant again called for the work release van to pick him up and witness Mark Chastain waited until the Defendant was picked up by the work release van.
On April 27, witness Hardnette who was also a resident at the work release center found a work uniform that had been stuffed under his bunk which did not belong to him. At about the same time witness Smith, another resident of the work release center, found a pair of work boots under his bunk. Both items of clothing were turned over to the supervisors and were later identified by the witnesses as belonging to the Defendant as the Defendant, Donald Broadnax was the only one at the work center who wore Red Wing brand work boots. There were further identifying marks on the work uniforms showing that the uniforms had been issued to the Defendant, Donald Broadnax. On further examination of the work uniform and the boots, it was determined that blood was present on all the pants, the shirts and the boots previously identified as belonging to the Defendant.
There was further testimony from Birmingham Police Sgt. Vince Cunningham that he had travelled from the scene of the crime wherein the bodies were found, to the location of Wellborn Forest Products and the time frame, within which this double murder occurred could have easily been traversed by the Defendant and the Defendant could have returned to work within the time frame as set out by the evidence.

FINDING OF FACTS FROM THE PUNISHMENT HEARING
At the punishment phase of the trial before the jury the State requested and was granted that the evidence introduced in the trial-in-chief be incorporated into the punishment phase before the jury. The State presented evidence of four (4) aggravating circumstances, that being that the capital offense was committed by a person under sentence of imprisonment pursuant to [ ]13A-5-49(1), and that the capital offense was committed by the Defendant after he had previously been convicted of a felony involving the use of a threat of violence to a person pursuant to [ ]13A-5-49(2), and further that the capital offense was committed while the Defendant was engaged in the commission of an attempt to commit kidnapping pursuant to [ ]13A-5-49(4), and last that the capital felony was especially heinous, atrocious, and cruel pursuant to [ ]13A-5-49(8).
The defense presented testimony by the Defendant's sister, Mrs. Dorothy McKinstry, who testified she was a resident of Lansing, Michigan, and that when the Defendant was fifteen years of age that he came to live with her and stayed there during the school year. She further stated that her mother and father were not able to care for the Defendant at that time as he was having problems in school, the problems being trouble with other kids, trouble around the community, and completing his school work.
The Defendant's sister further testified that Donald did not have normal social contact with people and that he never really learned how to behave around other people. She further testified that he was placed in special education classes and further that he did not have very many friends and he did not have very many toys to play with when he was a child. The Defendant's sister further testified that she was never aware that he had been diagnosed as having any lack of intelligence or being retarded. No additional testimony was taken during the punishment phase of the proceedings.
*230 After opening statements and summation by both the attorneys for the State and attorneys for the defense the Court again charged the jury as to the applicable law in the punishment phase of the proceedings. The Court enumerated the aggravating circumstances as being that the capital offense was committed by a person under sentence of imprisonment pursuant to [ ]13A-5-49(1), and that the capital offense was committed by the Defendant after he had previously been convicted of a felony involving the use of a threat of violence to a person pursuant to [ ]13A-5-49(2), and further that the capital offense was committed while the Defendant was engaged in the commission of or an attempt to commit kidnapping pursuant to [ ]13A-5-49(4), and last that the capital felony was especially heinous, atrocious, and cruel pursuant to [ ]13A-5-49(8).
The Court further charged on all the statutory mitigating circumstances as set out in [Section] 13A-5-51 and informed the jury that they were not bound by only the statutory mitigating circumstances but may consider any other circumstances in mitigation. The Court further charged the jury that in determining punishment the jury must avoid any influence of passion, prejudice, or any other arbitrary factors. Further, that the burden was on the State to prove the aggravating circumstances beyond a reasonable doubt and to a moral certainty; however, the mitigating circumstances need only be proven to their reasonable satisfaction. The Court further charged the jury that it was not the ... number of aggravating circumstances as opposed to the number of mitigating circumstances or the number of mitigating circumstances as opposed to the aggravating circumstances but the seriousness or the gravity of the aggravating circumstances and the mitigating circumstances as shown by the mitigating circumstances proven to the jury's reasonable satisfaction. The jury, after due deliberation, affixed punishment at death and on questioning the jury individually, determined that the vote of the jury in favor of death was correctly shown by the verdict form, that being that all twelve (12) jurors recommended that punishment be affixed at death by electrocution. The Court further makes the finding that in affixing the punishment the jurors were not influenced by passion, prejudice or any other arbitrary factors.

FINDING OF FACTS FROM THE SENTENCE HEARING BY THE COURT
On this the 12th day of September, 1997, the Defendant, Donald Broadnax, coming into Court with his counsel, Hon. William J. Brower and Hon. Darryl Bender and Deputy District Attorneys Don Cochran and Laura Petro, this Court having been the trial Court and having heard all testimony in this matter adopts all evidence previously presented at the guilt phase of the proceedings and the sentencing phase of the proceedings, both proceedings being held before the Court and the evidence presented before the jury in both hearings is incorporated in this hearing to be considered by the Court in affixing punishment. The court finds from the evidence four (4) aggravating circumstances were present in this case. The first is that the capital offense was committed by a person under sentence of imprisonment, pursuant to [ ]13A-5-49(1). The second aggravating circumstance was that the capital offense was committed by the Defendant after he had previously been convicted of a felony involving the use of threat of violence to a person, pursuant to [ ]13A-5-49(2). The third aggravating circumstance was that the capital offense was committed while the Defendant was engaged in the *231 commission of or an attempt to commit kidnapping, pursuant to [ ]13A-5-49(4), and the fourth aggravating circumstance, that the capital felony was especially heinous, atrocious [or] cruel, pursuant to [ ]13A-5-49(8). The especially heinous atrocious, [or] cruel aggravating circumstance pursuant to [ ]13A-5-49(8) was well established which showed that the victim, Hector J. Stamps, was brutally murdered in the presence of her grandson, DeAngelo Stamps, and immediately after the murder, the victim, DeAngelo Stamps's grandmother, was stuffed into the trunk of the automobile and driven from the scene of the first murder approximately one and a half hours away to the scene of the second murder where the four-year-old grandson, DeAngelo Stamps, was brutally murdered. The manner in which the death of the grandmother was caused in the presence of the four-year-old grandson and the manner in which the death of the four-year-old grandson ensued and the terror inflicted on the mind of the four-year-old grandson raises this crime to a [conscienceless] and pitiless crime which was unnecessarily torturous to the victim and, therefore, fell into the category of especially heinous, atrocious, [or] cruel.
These four aggravating circumstances were the only aggravating circumstances considered against the Defendant by the Court in this case.
The Court specifically finds that aggravating circumstance number three under [ ]13A-5-49(3) did not apply in that the Defendant did not knowingly create a great risk of death to many persons.
The Court further finds that aggravating circumstance number five under [ ]13A-5-49(5) does not apply in that the capital offense was not committed for the purposes of avoiding or preventing a lawful arrest or affecting an escape from custody.
The Court further finds that aggravating circumstance number six under [ ]13A-5-49(6) does not apply in that the capital offense was not committed for pecuniary gain and further that aggravating circumstance number seven under [ ]13A-5-49(7) does not apply in that the capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. The Court specifically finds that the four aggravating circumstances heretofore mentioned under [ ]13A-5-49(1), 13A-5-49(2), 13A-5-49(4), and 13A-5-49(8) do apply; however, aggravating circumstances number [ ]13A-5-49(3), 13A-5-49(5), 13A-5-49(6) and 13A-5-49(7) do not apply.

MITIGATING CIRCUMSTANCES
The Court does not find statutory mitigating circumstance number one under [ ]13A-5-51(1) to be present, to-wit: that the Defendant has no significant history of prior criminal activity, because he had previously been convicted of the crime of murder and at the time of the occurrence of this offense was serving time in the penitentiary for said offense.
The Court does not find that statutory mitigating circumstance number two under [ ]13A-5-51(2) was present in that the Court found no evidence that the capital offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance.
The Court does not find that statutory mitigating circumstance number three under [ ]13A-5-51(3) was present in that the victim was not a participant in the Defendant's conduct and did not consent to his action.
*232 The Court does not find that statutory mitigating circumstance number four under [ ]13A-5-51(4) was present in that the Defendant, Donald Broadnax was not an accomplice in the capital offense, in that he was the sole participant and his participation was not relatively minor.
The Court does not find statutory mitigating circumstance number five under [ ]13A-5-51(5) to be present in that the Court found no evidence that the Defendant was acting under extreme duress or under the substantial domination of another person.
The Court does not find statutory mitigating circumstance number six under [ ]13A-5-51(6) to be present in that the Court found that there was no evidence that the Defendant, Donald Broadnax, was unable to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law and further found there was no evidence that his ability to conform his conduct to the requirements of the law was substantially impaired.
The Court does not find statutory mitigating circumstance number seven under [ ]13A-5-51(7) to be present in that the Defendant, Donald Broadnax, was 35 years of age at the time to the commission of this offense; therefore, the age of the Defendant at the time of the commission of the crime was not a mitigating circumstance.
The Court, therefore, found that none of the statutory mitigating circumstances were present and none applied to the evidence as presented in this case either in the trial during the guilt phase, the evidence presented during the sentencing phase, or any presented during arguments by counsel.

NONSTATUTORY MITIGATING CIRCUMSTANCES
At the sentencing phase before the jury the defense presented testimony by the Defendant's sister Mrs. Dorothy McKinstry, who testified she was a resident of Lansing, Michigan, and that when the Defendant was fifteen years of age that he came to live with her and stayed there during the school year. She further stated that her mother and father were not able to care for the Defendant at that time as he was having problems in school, the problems being [he was] in trouble with other kids, [in] trouble around the community, and [not] completing his school work. She further said that she thought that the Defendant had been suspended from school and she wanted to bring him to Michigan to see if she could give him closer supervision. She further testified that after the school year was completed that the Defendant moved from Michigan back to Alabama and shortly thereafter was arrested for murder. [She] testified further that she was aware that he was convicted for murder and sentenced to the penitentiary at approximately age seventeen and after approximately ten (10) years of the service of his sentence he was released on probation (which was probably parole) and subsequent to that date the parole was revoked and he was placed back in the penitentiary.
The Defendant's sister further testified that Donald did not have normal social contact with people and that he never really learned how to behave around other people. She further testified that he was placed in special education classes and further that he did not have very many friends and he did not have very many toys to play with when he was a child. The Defendant's sister further testified that she was never aware that he had been diagnosed as having any lack of intelligence or being retarded. Mrs. McKinstry was apparently very close to her brother because she stated that she stayed in frequent contact with him during the time *233 that he was in the penitentiary and that the Defendant would call her by telephone and they would communicate by phone.
The Court, in considering the testimony of the Defendant's sister even in the most favorable light on behalf of the Defendant found that any mitigating circumstance of an antisocial personality disorder that she may have testified to was greatly outweighed by the aggravating circumstances as presented in the evidence in this case and that even in consideration, if this is a mitigating circumstance, that it is totally outweighed by the aggravating circumstances as presented by the evidence.
After consideration of all of the matter that [was] presented to this Court, the testimony heard at trial and the sentencing hearing before this court, both in mitigation and by aggravation, taking into consideration all other matters that were proffered before this Court as hereinabove stated in this order and disregarding pleas or references to the Court to consider this sentence on basis of passion or prejudice [the] Court does now find and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances and are sufficient to uphold the jury's recommendation of punishment at death.
The Court hereby affixes the punishment of the Defendant, Donald Broadnax at death
ORDERED this the 12th day of September, 1997.
/s/James S. Garrett
James S. Garrett
Circuit Judge
NOTES
[1] In accordance with the provisions of Rule 24.4, Ala.R.Crim.P., the prosecutor and defense counsel expressly consented to continue the motion until the date it was denied.
[2] See Frye v. United States, 293 F. 1013 (D.C. 1923).
[3] Rule 19.3 was amended, effective December 1, 1997, to be consistent with  12-16-9.
[4] Pursuant to Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), Broadnax would be entitled to any agreements or deals the state made with any witnesses. However, Broadnax provides no information or evidence on appeal other than bare speculation that any witness was rewarded in any way for his or her testimony. Without more of a showing, we cannot conclude that the state had agreements with witnesses that it failed to reveal.
[5] The record indicates that Broadnax was arrested for the murders on May 2, 1996.
[6] In his brief to this Court, Broadnax cites Vol. IV at 266, 275, and 312. On pages 266 and 312, we find no discussion of the admission of any item of evidence. On page 275, the trial court admitted into evidence three crime scene photographs taken by Persons.
[7] The state of Alabama was represented by two prosecutors, a male and a female.
[8] Broadnax also cites to R. Vol. VI at 725 for an incident of prosecutorial misconduct. However, he does not direct this Court to any specific incident. We have reviewed this portion of the record and can find nothing that might be considered remotely objectionable.
[9] Broadnax cites this Court to the following portions of the record: R. Vol. VII at 144; Vol. VIII at 231; Vol. VIII at 232; Vol. VIII at 238; and Vol. VIII at 250-251.
[10] Broadnax does not provide this Court with specific quotations from the record; he merely refers the Court generally to R. Vol. II at 167-68 and Vol. VIII at 238.
[11] For a more detailed discussion of the propriety of venue in Jefferson County, see Part XVII of this opinion.
[12] Alexander City is in Tallapoosa County.
[13] We note that initially during the trial judge's instruction to the jury, he included the murder of Jan in his reading of counts 3 and 4 of the indictment. (R. 267-68.) However, when he specifically instructed the jury concerning its determinations with regard to Counts III and IV, he indicated that these counts applied only to the murder of DeAngelo. (R. 278-85.) Moreover, we note that the inclusion of the murder Jan in Counts II, III, and IV of the indictment does not affect the validity of Broadnax's convictions. The references in these counts to the murder of Jan merely constituted unnecessary allegations because they were not material to the offenses charged in those counts and could be disregarded. Rule 13.2(d), Ala.R.Crim.P.
[14] In the indictment, the state alleged that Broadnax abducted or attempted to abduct DeAngelo Stamps with the intent to inflict physical injury upon him or to violate him sexually. (C.R.25.) See also  13A-6-43(a)(4), Ala.Code 1975.
[15] Issue X.B. in Broadnax's brief to this Court at p. 63.
[16] Broadnax acknowledges in his brief to this Court that the trial court did instruct the jury on the elements of the "especially heinous, atrocious, or cruel" aggravating circumstance. See Broadnax's brief to this Court at p. 38, fn. 11.
[17] We note that this procedure is referred to in the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried under Act No. 81-178.
[18] We have reviewed the trial court's findings of facts from the trial contained in its sentencing order and conclude that they comply with  13A-5-47(d), Ala.Code 1975.
[1] The trial court filed its sentencing order on return to remand on August 14, 2000. In preparation to conduct our review, this Court noted that the order contained statements regarding procedural matters that were not reflected in the record. This Court issued an order, pursuant to Rule 29, Ala.R.Crim.P., for the trial court to correct the discrepancy. On October 6, 2000, the trial court filed an amended sentencing order, which is attached to this opinion as Appendix A, with this Court.